## STATE OF CONNECTICUT *v.* MICHAEL J. LATOUR
(SC 17177)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued October 19—officially released December 13, 2005

*Adele V. Patterson*, assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, was *Patricia M. Froehlich*, state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The dispositive issue in this direct appeal is whether the denial of a defendant's request to exercise a peremptory challenge of a venireperson, who served

solely as an alternate, can constitute an impropriety that requires a new trial in the absence of an analysis on the issue of harm. The defendant, Michael J. Latour, appeals from the trial court's judgment of conviction, rendered after a jury trial, claiming that the trial court improperly denied his peremptory challenge of a venireperson and that the impropriety was a structural error requiring a new trial.[1] We affirm the judgment of the trial court.

The record discloses the following facts and procedural history. The defendant was charged with the murder of Jenny McMechen in violation of General Statutes § 53a-54a (a) and criminal possession of a firearm by a person previously convicted of a felony in violation of General Statutes § 53a-217 (a) (1). During the trial, although there were no eyewitnesses to the murder, the jury heard from several state's witnesses who, in their descriptions of the defendant's whereabouts on the night in question, placed him coming and going from the house where the victim was shot. Additionally, these witnesses testified that, when the defendant entered the house, he was in possession of a firearm, that they heard him call the victim's name, followed by gunshots, and that later that night and the next day he admitted to the shooting. The jury also learned that the defendant and the victim had been in a relationship for more than one year and that the victim was thirty-six weeks pregnant at the time of her death. The defendant presented no witnesses.

Following the trial court's denial of the defendant's motion for judgment of acquittal on the criminal posses-

_____

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

sion charge, the court found the defendant guilty of that charge. The jury then found the defendant guilty on the murder charge and, by special verdict, also found the defendant guilty of having used a firearm in the commission of that offense in violation of General Statutes § 53-202k. The trial court thereafter rendered judgment in accordance with the verdicts and imposed a total effective sentence of life imprisonment plus ten years. This appeal followed.

Because the sole issue on appeal concerns legal rulings made during the jury selection process, we highlight the following additional facts reflected in the record. Twelve jurors and four alternates ultimately were selected to serve on the defendant's jury. The advanced stage of the victim's pregnancy at the time of her death was a significant subject of voir dire. During the third day of jury selection, the state objected to the defendant's exercise of his eighth peremptory challenge, alleging that he unlawfully had been exercising his peremptory challenges with the intent of excluding women from serving on his jury in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and *J.E.B.* v. *Alabama*, 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). The state recited as part of its objection that, up to that point in time, the record reflected the following facts. On December 2, 2003, the first day of jury selection, three male jurors were impaneled; the state struck one prospective male juror, the defendant struck two prospective female jurors and the court excused one other prospective female juror for cause. On December 3, 2003, four jurors were impaneled, three males and one female; the state struck one prospective male juror, the defendant struck one prospective male juror and two prospective female jurors, and the court excused five prospective female jurors for cause. Subsequently, on December 4, 2003, three male jurors were impaneled; the state struck one

prospective male juror, the defendant struck one prospective female juror and the court excused one prospective male juror for cause. In sum, ten jurors, nine of whom were males, had been selected, the defendant had exercised seven of his eighteen allotted peremptory challenges, five as to females, and the state had exercised four peremptory challenges, three of them as to males. It was when the defendant attempted to exercise a peremptory challenge of venireperson D.L., his sixth challenge as to a female, that the state objected.

The defendant argued that he should not be required to articulate a gender neutral reason for excusing the juror. Following a brief argument on what standard should be applied before requiring the defendant to state his reasons for exercising a peremptory challenge,[2] the trial court allowed the defendant to excuse the juror without any explanation, indicating that it would see how things developed with the next three jurors.

The next venireperson to be questioned was E.W., a female, against whom the defendant also exercised a peremptory challenge. Again, the state objected, claiming a *Batson* challenge based on gender, and the defendant again argued that he should not be required to articulate a gender neutral reason for excusing the juror, suggesting as a remedy that the court instead impanel the female venireperson whom the state had challenged the previous day. The trial court noted that the state justifiably had excluded that female juror in light of her difficult disposition, but allowed the defen-

---

[2] The defendant argued to the trial court that a higher standard than that applied to prosecution challenges should be applied before a defendant is required to provide reasons for exercising his peremptory challenges, requiring that the state prove beyond a reasonable doubt that the defense challenge was based on gender. The state countered that the defendant had not proffered "any legal reason why he should not be required to set forth a gender neutral explanation for the exercise of the peremptory [challenge]."

dant to excuse E.W. without requiring him to assert a gender neutral reason, stating that the court would familiarize itself with the pertinent legal authorities as to whether such an articulation should be required. Later that same day, however, the court did express concern that it perceived a pattern by the defendant— in that seven out of eight of his challenges had been against females, thus resulting in the selection of one female juror out of ten jurors—and hoped that this pattern would cease.

On December 9, 2003, of the fourteen females on the venire panel, the court excused seven for cause without questioning. Of the six females who were fully voir dired, the court excused three for cause, the state exercised its peremptory challenges as to two others and the defendant attempted to exercise a peremptory challenge as to the sixth female venireperson, L.S., after the court had denied the defendant's attempt to challenge her for cause. Claiming its right to invoke the equal protection clause of the fourteenth amendment to the federal constitution to limit the defendant's use of his peremptory challenge to excuse L.S., the state again objected to the defendant's challenge. The trial court ruled that it would adhere to Connecticut practice, which does not require the party raising such an objection to make a showing of purposeful discrimination before requiring the party seeking to exercise the peremptory challenge to provide a gender neutral explanation for the challenge. The court then found that the defendant had excluded seven females through the use of his peremptory challenges and that the state had established a prima facie case of discrimination. Accordingly, the court ordered the defendant "to advance a nondiscriminatory explanation for [L.S.'s] removal . . . . [Thereafter], the state will have the opportunity to demonstrate that the explanation is [pretextual] or otherwise insufficient. The state bears the

ultimate burden of persuading the court by a preponderance of the evidence that the jury selection is tainted." The defendant then provided a nondiscriminatory reason for his challenge.[3] Following argument on the issue, the trial court allowed the challenge, relying in part on the defendant's explanation.

By December 10, 2003, eleven males and one female had been impaneled to serve as jurors, and two females and one male had been selected to serve as alternates. That day, both the state and the defendant exercised one peremptory challenge against prospective alternate male jurors, and the defendant, after being required by the court to state a gender neutral reason, exercised a challenge to a prospective alternate female juror, L.W. With one more alternate juror to select, the defendant questioned another female venireperson, K.N., against whom he also tried to exercise a peremptory challenge. Without any instigation by the state, the court required the defendant to provide a "gender neutral explanation . . . ." Over objection, the defendant provided two reasons, the primary one being that he personally had sensed some hostility from K.N.[4] The state disagreed

---

[3] The defendant described his process for deciding whether to challenge L.S., citing several factors. With respect to one factor in his considerations— how a juror would react in light of the fact that victim was thirty-six weeks pregnant—the defendant stated that he wanted to exclude from the jury persons "who have strong communal, nurtur[ing], and maternal feelings." He wanted jurors who were, "cold, emotionless" people. As the defendant described it, he wanted as a juror the type of person who would be annoyed by a crying, lost two year old child at a supermarket, not the type of person who would help the child. L.S. had stated during voir dire that the victim's pregnancy would be emotional for her. The court concluded that the defendant's proffered reasons for excluding L.S. generally were not pretextual— she knew two of the potential witnesses, had work conflicts with serving as a juror and expressed concern about dealing with the victim's pregnancy— and thus expressly declined to address the defendant's rationale as to excluding jurors with maternal feelings.

[4] Defense counsel first explained: "Okay. [The defendant] feels that this lady does not like him. The way that her whole body language—she didn't look at him throughout the course of this. He senses some hostility arising from her and just feels instinctively that this juror would be hostile toward him.

with the defendant's perceptions of K.N. and claimed that the defendant's reason was pretextual. The trial court agreed with the state. Although the court accepted the defendant's explanation as to his feelings about K.N., it did not consider that explanation to be "a valid reason" to exclude K.N. from the panel. Accordingly, the court disallowed the peremptory challenge, and K.N. was seated as a fourth alternate juror. On January 6, 2004, two of the alternate jurors were selected by drawing lots to replace excused jurors. K.N. was not one of those alternates chosen. It is the trial court's disallowance of the defendant's peremptory challenge to K.N. that forms the basis of this appeal.

On appeal, the defendant first contends that the trial court unnecessarily engaged in the first step of the *Batson* analysis when concluding that the state had established a prima facie case of gender discrimination. He acknowledged both that he failed to object to this alleged procedural flaw and that this determination would not constitute a significant impropriety had the court not thereafter determined that the defendant's reasons for striking K.N. were not sufficient. It is the conclusion by the trial court—that the defendant's rea-

"That's the primary reason. I always—in selecting a juror I recognize that the law says that the decision as to whether to exercise a peremptory [challenge] rests with the attorney, rather than the client. . . . I never had this situation where I felt strongly that I should not exercise a peremptory [challenge] or I should exercise a peremptory [challenge] and the client felt differently.

"But if that were to arise, that would always fall to the client's views rather than my own. Just because I think that sitting in this seat you get a better sense of how someone feels about you than I can in talking with [the juror]."

Defense counsel asserted as his second reason for exercising a peremptory challenge to K.N. his desire to reach the next person on the venire panel, a female who he presumed to be of Chinese descent, a person with whom counsel believed he might be able to form a connection in the presentation of his case. Defense counsel explained that, "if I don't exercise a challenge against this juror, I won't be able to ever see the next juror."

son,[5] although genuine and nondiscriminatory, was not adequate—that he claims was improper. Specifically, the defendant claims that, as long as the trial court found the defendant's reason for his efforts to excuse K.N. to be honest and credible, the court should not have disallowed his peremptory challenge. In other words, because the defendant had provided a reason that was nondiscriminatory, which the trial court credited, the court improperly required K.N. to be seated as an alternate juror. The defendant further claims that this impropriety is not subject to a harmless error analysis like most constitutional violations, but instead was a structural error, necessitating that the judgment of conviction be reversed and that he be given a new trial.

The state responds that, even if the trial court had believed that the defendant thought venireperson K.N. had indeed been hostile toward him,[6] the court nevertheless properly determined, based in part on the number of female venirepersons the defendant had removed already, that the stated reason for the challenge was pretextual. The state also maintains that, even if the trial court improperly rejected the defendant's exercise of his challenge, the impropriety was harmless in light of the fact that K.N. remained an alternate juror and never was called to serve. Even if we were to assume, arguendo, that the trial court improperly required K.N. to be seated, we agree with the state that the impropriety is subject to a harmless error analysis and that, because K.N. remained an alternate, the error was harmless.

Before addressing the merits of the defendant's claim, we set forth the well established legal principles that

[5] The defendant offered two facially gender neutral reasons for excluding K.N.; see footnote 4 of this opinion; but relies only on the first proffered reason in connection with this appeal.

[6] The state also contends that the record does not support the defendant's "feeling," and, therefore, that his explanation for exercising a peremptory challenge, although neutral, was not valid.

govern our review, which we recently have reiterated. "In *Batson* [v. *Kentucky*, supra, 476 U.S. 79] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids [a party] to challenge potential jurors solely on account of their race . . . ."[7] (Internal quotation marks omitted.) *State* v. *Peeler*, 267 Conn. 611, 620–21, 841 A.2d 181 (2004). "Relying on the rationale underlying *Batson*, the United States Supreme Court has held that gender-based challenges also are impermissible." *State* v. *Hodge*, 248 Conn. 207, 218, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999), citing *J.E.B.* v. *Alabama*, supra, 511 U.S. 146.

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting

[7] The court also has extended the application of *Batson* to race based peremptory challenges made by criminal defendants. See *Georgia* v. *McCollum*, 505 U.S. 42, 57, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992); see also id., 56 (in concluding that state had standing to assert excluded jurors' rights in regard to defendant's exercise of peremptory challenges, court held that "the [s]tate is the logical and proper party to assert the invasion of the constitutional rights of the excluded jurors in a criminal trial").

the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to [a party's] intent. The [judicial] officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one.

As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Peeler*, supra, 267 Conn. 621–22.

In considering the nature of a claimed constitutional violation, although typically such violations are reviewed for harmless error, there is a limited class of violations that we review for structural error. "Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . These cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. . . . Such errors infect the entire trial process . . . and necessarily render a trial fundamentally unfair . . . . Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." (Internal quotation marks omitted.) *State* v. *Lopez*, 271 Conn. 724, 733–34, 859 A.2d 898 (2004).

"When the error undermines the structural integrity of the tribunal, no review for harmless error or prejudice to the defendant need be made. Such an error can never be harmless and automatically calls for reversal and a new trial. See *Chapman* v. *California*, 386 U.S. 18, 23, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). For example, an automatic reversal is required when the judge has a financial interest in the outcome of a trial despite the lack of any indication that his bias affected the outcome; *Tumey* v. *Ohio*, 273 U.S. 510, 535, 47 S. Ct. 437, 71 L. Ed. 749 (1927); or when there is a systematic exclusion from a grand jury of blacks; *Vasquez* v. *Hillery*, 474 U.S. 254, 263–64, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986); or when a defendant has been denied the assistance of counsel; *Glasser* v. *United States*, 315 U.S. 60, 76, 62 S. Ct. 457, 86 L. Ed. 680 (1942); or when inherently adverse publicity has tainted the trial; *Sheppard* v. *Maxwell*, 384 U.S. 333, 351–52, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); or when there exists purposeful discrimination in the selection of jurors. *Whitus* v. *Georgia*, 385 U.S. 545, 549–50, 87 S. Ct. 643, 17 L. Ed. 2d 599 (1967). These cases do not involve trial error occurring during the presentation of the case to the jury but involve extrinsic factors not occurring in the courtroom. Nor do they require any showing of prejudice to the defendant. These cases recognize that violation of some constitutional rights, such as the right to a trial by an impartial jury, may require reversal without regard to the evidence in the particular case. This type of structural error renders a trial fundamentally unfair and is not susceptible to a harmless error analysis; see *Rose* v. *Clark*, 478 U.S. 570, 577–78, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986); or an analysis based on prejudice to a defendant. See *State* v. *Booth*, 250 Conn. 611, 649, 737 A.2d 404 (1999) [cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000)]. A harmless error analysis presupposes a

trial at which a defendant is represented by counsel, and evidence and argument are presented in the courtroom before an impartial judge and jury. *Rose* v. *Clark*, supra, 578. When a structural error analysis is undertaken and such an error exists, the proceeding is vitiated. See *Arizona* v. *Fulminante*, [499 U.S. 279, 309–10, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)]; *State* v. *Cruz*, 41 Conn. App. 809, 811, 678 A.2d 506, cert. denied, 239 Conn. 908, 682 A.2d 1008 (1996); *State* v. *Suplicki*, 33 Conn. App. 126, 130, 634 A.2d 1179 (1993), cert. denied, 229 Conn. 920, 642 A.2d 1216 (1994). *State* v. *Anderson*, 55 Conn. App. 60, 72–74, 738 A.2d 1116 (1999), rev'd, 255 Conn. 425, 773 A.2d 287 (2001); see *State* v. *Anderson*, supra, 255 Conn. 448 (concluding no structural defect existed under circumstances of particular case)." (Internal quotation marks omitted.) *State* v. *D'Antonio*, 274 Conn. 658, 722–24, 877 A.2d 696 (2005) (*Katz, J.*, dissenting).

We assume without deciding that the trial court, having found the defendant's gender neutral explanation for his peremptory challenge to be credible, improperly required juror K.N. to be seated. As the discussion that follows demonstrates, we need not make such a determination because, even if the defendant could prevail as to that first step in our analysis, he cannot prevail under the second step. Accordingly, we turn to the second step, namely, whether that impropriety is a per se reversible, structural error or whether it is subject to a harmless error analysis and, if the latter, whether, because the juror remained an alternate, the error was harmless.

The defendant contends that, "[b]ecause the issue is one of jury selection—that the defendant was required to try his case to a jury which included an individual who properly should have been the subject of his constitutionally protected exercise of a peremptory challenge—the error is structural in nature . . . ." He relies

on *Tankleff* v. *Senkowski*, 135 F.3d 235, 248 (2d Cir. 1998), wherein the Second Circuit Court of Appeals concluded: "Because the effects of racial discrimination during voir dire may persist through the whole course of the trial proceedings, *Powers* [v. *Ohio*, 499 U.S. 400, 412, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991)], we hold that a *Batson/Powers* claim is a structural error that is not subject to harmless error review. See *Ford* v. *Norris*, 67 F.3d 162, 171 (8th Cir. 1995) (holding that a constitutional violation involving the selection of jurors in a racially discriminatory manner is a structural defect . . . which cannot be subjected to a harmless error analysis); *Rosa* v. *Peters*, 36 F.3d 625, 634 n.17 (7th Cir. 1994) (holding that harmless error analysis is inappropriate in a *Powers* case); *Ramseur* v. *Beyer*, 983 F.2d 1215, 1225 n.6 (3d Cir. 1992) ([e]n banc) ([H]armless error analysis is inappropriate in cases involving discrimination in the jury selection process.), cert. denied, 508 U.S. 947, 113 S. Ct. 2433, 124 L. Ed. 2d 653 (1993)." (Internal quotation marks omitted.)

The defendant's reliance on *Tankleff*, however, is misplaced. In that case, the record before the Second Circuit suggested a prima facie *Batson* violation in that the trial court had refused to allow the defendant to object to the state's attempts to strike the only three African-American venirepersons because the defendant was not of the same race as the challenged jurors.[8] *Tankleff* v. *Senkowski*, supra, 135 F.3d 249. Thus, the alleged trial court impropriety resulted in the *exclusion* of jurors based on race. As the Second Circuit recog-

---

[8] In *Tankleff* v. *Senkowski*, supra, 135 F.3d 249, the trial court had not permitted a full discussion of the defendant's *Batson* challenge and, therefore, the state never had the opportunity to offer a race neutral reason for its objections to the African-American venirepersons. In light of the record, therefore, the Second Circuit concluded that the case should be remanded to the trial court for a hearing on the *Batson* issue, but that, should the trial court be unable to reach a reasoned conclusion due to the lapse of time, the defendant was entitled to a new trial. Id., 249–50.

nized, exclusion of jurors under those circumstances could never be harmless, because, even when "the excluded jurors are of a different race than [the defendant's] . . . racial discrimination in jury selection casts doubt on the integrity of the judicial process and places the fairness of a criminal proceeding in doubt." (Internal quotation marks omitted.) Id., 240. In *Tankleff*, the trial court impropriety potentially could have had a direct impact on the jury that decided the defendant's guilt.[9]

There are cases holding that structural error analysis is appropriate when addressing a case in which the trial court refused to allow the defendant to exercise a challenge to a juror who ultimately was seated and not excused. See, e.g., *United States* v. *McFerron*, 163 F.3d 952, 956 (6th Cir. 1998); *United States* v. *Annigoni*, 96 F.3d 1132, 1143 (9th Cir. 1996) (en banc); *United States* v. *Broussard*, 987 F.2d 215, 221 (5th Cir. 1993). There is a critical distinction, however, between such cases and one in which the improperly seated juror remains an alternate and, therefore, had no possible impact on the deliberative process, as in the present case. See, e.g., *Carter* v. *Kemna*, 255 F.3d 589, 592–93 (8th Cir. 2001) ("if no alternate deliberates on the verdict, a court could reasonably believe the improper exclusion of an alternate juror is not a structural error because it is clear the error never affected the makeup of the petit jury that decided to convict the defendant"); *United States* v. *Evans*, 848 F.2d 1352, 1357 (5th Cir.) (because neither of two alternate jurors served on jury, fact that defendant was denied right to use peremptory challenge against one of them could have no effect on

---

[9] We note that there are, however, circumstances in which harmless error analysis may be appropriate even when the impropriety relates to the exclusion of jurors. See *State* v. *Ford*, 334 S.C. 444, 449, 513 S.E.2d 385 (App. 1999) (even if judge erred in accepting prosecutor's reasons for striking potential female juror, error harmless because she had been struck as alternate and use of alternates was not necessary during trial).

trial), modified in part on other grounds and rehearing en banc denied, 854 F.2d 56 (1988); *State* v. *Bonnett*, 348 N.C. 417, 436, 502 S.E.2d 563 (1998) (any error in trial court's denial of defendant's challenge for cause to alternate juror was harmless as alternate did not serve as one of twelve jurors who decided defendant's case), cert. denied, 525 U.S. 1124, 119 S. Ct. 909, 142 L. Ed. 2d 907 (1999); *Commonwealth* v. *Stafford*, 450 Pa. 252, 257, 299 A.2d 590 (defendant not harmed by court's refusal to remove allegedly biased juror because juror was seated as alternate and excused after trial court's charge), cert. denied, 412 U.S. 943, 93 S. Ct. 2775, 37 L. Ed. 2d 404 (1973); *State* v. *Green*, 301 S.C. 347, 354, 392 S.E.2d 157 (any error in qualification of venireperson as alternate juror was harmless beyond reasonable doubt in light of fact that it never became necessary to use alternates), cert. denied, 498 U.S. 881, 111 S. Ct. 229, 112 L. Ed. 2d 183 (1990). In such cases, the alternate juror who should not have been included on the panel had no "pervasive effect on the trier of fact . . . ." *People* v. *Rodriguez*, 50 Cal. App. 4th 1013, 1035, 58 Cal. Rptr. 2d 108 (1996) (holding that improper exercise of peremptory challenge by state during selection of alternate jurors was subject to harmless error analysis because "[w]ith the benefit of hindsight, we can determine whether the defendant suffered any harm as a result of the trial court's error"), cert. denied, 1997 Cal. LEXIS 962 (February 19, 1997). In the present case, because K.N. had no opportunity to sit as a fact finder and, therefore, to influence the deliberative process, the impropriety is subject to a harmless error analysis and, indeed, was harmless.

The judgment is affirmed.

In this opinion the other justices concurred.