******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PALMER, J., with whom McDONALD, J., joins, concurring in the judgment. I agree with the majority that the conviction of the defendant, Michael Anthony Edwards, should be affirmed. In particular, I agree that the defendant has failed to establish that the trial court was required to find that the prosecutor's use of a peremptory challenge to strike venireperson C.D. violated the constitutional proscription against racial discrimination in the jury selection process.[1] I disagree with the majority, however, with respect to its conclusion in part I of its opinion, that we may not consider certain supplemental authority that the defendant furnished to this court in accordance with Practice Book § 67-10,[2] namely, a recent National Geographic article entitled "The Changing Face of America."[3]

The facts and procedural history relevant to this issue are not in dispute. During the prosecutor's voir dire examination of C.D., he observed that C.D., in response to a question in the confidential juror questionnaire, had identified her race as "human." The prosecutor asked C.D., who apparently is a person of color, "[w]hy did you do that?" C.D. responded: "Because that is the race that I belong to." After both the prosecutor and defense counsel had completed their questioning of C.D., the prosecutor exercised a peremptory challenge against C.D. Defense counsel objected, claiming that the prosecutor appeared to have done so on account of impermissible racial considerations. The prosecutor replied that C.D.'s "response to the race [question] as human—I found that to be of concern to me because it seemed outside the norm of what one would expect to have placed in a questionnaire box, and I just found that to be disconcerting and didn't think that someone who would fill in . . . a line like that would necessarily be appropriate to serve as a juror. So that was one of the reasons . . . for not selecting her. I just was struck by that response as being unusual." The prosecutor continued: "I'm not saying it's wrong or anything. I just—that drew a red flag . . . with respect to her questionnaire, so that would be the primary basis for it . . . ." Defense counsel observed that the race question "probably shouldn't even be on the form," and then stated that, in his view, C.D.'s answer to the question on race was "appropriate . . . ." The prosecutor responded that his use of a peremptory challenge against C.D. had "nothing to do necessarily with the race of the venire[person]. It has to do with [her] response to the questionnaire, which struck me as odd given the fact that—and I can state this for the record, Your Honor—having picked a number of jurors in my lifetime, I've never seen that done before, and it just struck me . . . as so odd as to stand out, and [it] raised a red flag with me. I don't know that the response is correct

or incorrect; it's just something that I found to be odd, and, for that reason . . . I decided not to select this person as a juror." Defense counsel responded in part that "we really are one human race . . . . I don't think it's that odd of a response."

At that point, the trial court, after observing that the prosecutor had not exhibited any "pattern of exclud-[ing] . . . all jurors" of C.D.'s race, stated as follows: "[T]he court is going to conclude that, based on the court's experience, it is . . . somewhat of an unusual response to that question. Whether or not that [question] should be on the questionnaire . . . as [defense counsel] points out, it is on the questionnaire, it is asked . . . and we will certainly make the questionnaire a court exhibit in this case, but, in fact, as the prosecutor points out, [C.D.] did write ['human'] on the form, and, in the court's experience, that is somewhat unusual. So, I am going to find that that's a nondiscriminatory explanation for exercising that peremptory challenge and overrule the objection. . . . So, she will be excused."

On appeal to this court, the defendant claims that the trial court improperly overruled defense counsel's objection to the state's use of a peremptory challenge to excuse C.D. because the prosecutor "zeroed in on C.D.'s response on the *race* line of the questionnaire"; (emphasis in original); and, in so doing, improperly predicated his challenge on C.D.'s race in violation of the equal protection clause of the federal constitution. Alternatively, the defendant asserts that we should exercise our supervisory authority over the administration of justice "in jury selection, as [this court] has done before[4] . . . to preclude the use of racial self-identification as a ground for a peremptory challenge and to order a new trial in this case." (Citations omitted; footnote added.) According to the defendant, a new trial is warranted because, contrary to the state's contention, the manner in which C.D. chose to identify herself in regard to race is not odd or unusual but, rather, exemplifies an emerging new approach to racial self-identification among many persons of color, and, because this mode of self-identification relates to race, it is not a proper basis for excluding a venireperson from jury service. In support of his contention, the defendant cites to numerous articles and social science studies that demonstrate how changes in popular attitudes about race are reflected in the different ways in which people identify themselves with respect to race.[5] The state maintains that the prosecutor's use of a peremptory challenge against C.D. was proper because "[i]t was C.D.'s idiosyncratic answer to the race question, and not C.D.'s race, that triggered the prosecutor's exercise of [the] peremptory challenge." The state, however, did not object to any of the articles or studies cited by the defendant; instead, the state simply ignored them, essentially treating them as irrelevant to the issue of

whether the trial court properly concluded that the prosecutor's decision to exercise a peremptory challenge to excuse C.D. was not racially motivated.

After the parties filed their briefs in this court but before oral argument, the defendant, pursuant to Practice Book § 67-10, submitted a National Geographic article entitled "The Changing Face of America." See footnote 3 of this opinion. Like many of the articles on which the defendant relied in his briefs, the National Geographic article focuses on the fact that more and more people, like the multiracial persons who are discussed in the article, identify themselves differently than in the past. See L. Funderburg, "The Changing Face of America," National Geographic, October, 2013, pp. 83–87 ("The [United States] Census Bureau is aware that its racial categories are flawed instruments, disavowing any intention 'to define race biologically, anthropologically, or genetically.' And indeed, for most multiple-race Americans, including the people pictured [in this article], identity is a highly nuanced concept, influenced by politics, religion, history, and geography, as well as by how the person believes the answer will be used. . . . In today's presumably more accepting world, people with complex cultural and racial origins become more fluid and playful with what they call themselves."). Thus, for example, one individual depicted in the article, who identifies herself as "black" for census purposes, self-identifies as "biracial/'human being' . . . ." Id., p. 84. The state did not file an objection or other response to the defendant's submission. Two weeks after the submission was filed, however, this court, sua sponte, ordered that the parties "file simultaneous statements addressing whether the [National Geographic] article . . . is appropriate authority for submission pursuant to Practice Book § 67-10." In its statement, the state argued that the submission was improper; the defendant expressed the contrary view in his statement. This court elected not to act on the issue until after oral argument.

The majority now concludes, first, that the National Geographic article probably would not qualify as supplemental "authority" under Practice Book § 67-10 "because it certainly is not legal authority, as it is not a judicial or administrative decision; nor is it a treatise, annotation, or law review article." Footnote 13 of the majority opinion. The majority states that it need not decide definitively whether the article constitutes "authority" for purposes of § 67-10, because it is inappropriate for appellate courts to consider evidence that was not available to the trial court in order to conclude that the trial court's factual findings were clearly erroneous. In support of this conclusion, the majority, quoting *Moore* v. *Moore*, 173 Conn. 120, 122, 376 A.2d 1085 (1977), explains that "[t]his court has previously distinguished between legislative facts . . . which help determine the content of law and policy, and adjudica-

tive facts . . . concerning the parties and events of a particular case. . . . Legislative facts may be judicially noticed without affording the parties an opportunity to be heard, but adjudicative facts, at least if central to the case, may not." (Citation omitted; internal quotation marks omitted.) According to the majority, because the article consists largely of "anecdotal material drawn from interviews with multiracial individuals who describe what they think about their identities," and pertains to the "factual question" of whether C.D.'s response to the question of race in the juror questionnaire was unusual, this court may not properly consider it.

Although I agree with the majority that the defendant cannot prevail on either his constitutional claim or his supervisory authority claim,[6] I do not agree with the majority's analysis or conclusion with respect to the National Geographic article. First, I agree with the defendant that "[a]nything [that] would be appropriate to cite in [a party's] brief is appropriate to bring to the court's attention [pursuant to] Practice Book § 67-10." As I explain more fully hereinafter, the National Geographic article would have been appropriate to include in the defendant's brief, and, consequently, it is appropriate supplemental authority under § 67-10. Indeed, as I previously noted, the defendant's initial brief and reply brief contain numerous references to similar articles; see footnote 5 of this opinion; and neither the state nor this court has questioned the propriety of the defendant's reliance on them.[7]

I believe that the National Geographic article is appropriate authority for this court to consider for several reasons. First, the explanation that the prosecutor gave for exercising the peremptory challenge against C.D. was itself anecdotal in the sense that it was based solely on his personal experience in examining prospective jurors. Specifically, the prosecutor explained that he was uncomfortable with having C.D. serve as a juror because, in his experience, her response to the question about race in the jury questionnaire was "outside the norm," "unusual," and "odd . . . ." Defense counsel's reply was similarly anecdotal: in his subjective view, the prosecutor's reason for striking C.D. was inadequate because C.D.'s response in the juror questionnaire was neither inappropriate nor odd or peculiar. Finally, the trial court rejected defense counsel's argument that the prosecutor's use of the challenge was a pretext for discrimination on the basis of the court's own observation that, "in the court's experience, [C.D.'s response was] somewhat unusual."

In such circumstances, when the propriety of the prosecutor's conduct in striking a prospective juror depends entirely on anecdotal or subjective observations or considerations, I do not see why it is improper for this court to consider articles or similar sources of

information that bear directly on the reliability of those observations or considerations. Although such an article is not likely to be particularly persuasive—and it is not in the present case—it is at least minimally relevant when, as in the present case, the issue presented is the reasonableness of the trial court's determination, based solely on the court's own experience, that the prosecutor's reason for exercising the peremptory challenge was legitimate and not pretextual. Because of the anecdotal nature of the prosecutor's rationale for exercising a peremptory challenge against C.D., it also is not unfair to the state for this court to consider the National Geographic article even though that article contains anecdotal evidence. In other words, because the prosecutor's explanation for striking C.D. as a juror was not based on the "fact" that her response to the juror questionnaire was odd or unusual but on the prosecutor's belief, in light of his own experience, that the response was odd, it is not unfair for the defendant to use similar evidence to support his contention that the response was *not* odd or unusual.

Furthermore, because the issue presented by the prosecutor's use of the peremptory challenge against C.D. does not give rise to a typical question of fact—as I have explained, the question can be resolved only on the basis of anecdotal experiences as distinguished from truly verifiable facts—I do not believe that the distinction between legislative and adjudicative facts bears any real relevance to the determination of whether it is permissible for this court to consider the National Geographic article. I therefore do not agree that the defendant should be barred from furnishing this court with that article, or with any other such article, merely because defense counsel did not produce it during jury selection.[8] But that is what the majority would require: according to the majority, because the issue raised by the prosecutor's use of a peremptory challenge against C.D. involved adjudicative facts, the defendant is barred from providing this court with anything that he did not provide to the trial court. In fact, the majority states that, in a case involving the kind of "facts" that are implicated in the present case, the "parties must introduce [those] facts in the trial court, where they can be explained through expert testimony and tested through cross-examination." In other words, in response to the prosecutor's explanation as to why he had exercised a peremptory challenge against C.D., defense counsel was required to find any and all articles and to call any and all expert witnesses, right then and there, or else be denied the opportunity to provide the reviewing court with any such support for his position.

For obvious reasons, imposing such a rigid and unyielding rule on counsel selecting a jury—especially in circumstances such as those in the present case, in which the prosecutor's reason for striking a prospective juror was based entirely on the prosecutor's personal

experience—is highly impractical and unnecessary. Any such determination should be based on the particular facts and circumstances involved, including the precise nature of the *Batson*[9] claim, and not on an unbending application of the general principle that issues involving adjudicative facts ordinarily should first be presented to the trial court. It is one thing to impose such a burden on the parties at trial, as counsel will be aware at that time of the issue or issues for which expert testimony or other legal support may be necessary. See, e.g., *State* v. *Rizzo*, 303 Conn. 71, 180 n.76, 31 A.3d 1094 (2011) (this court will not consider extra-record social science reference materials to second-guess fact finder's weighing of aggravating and mitigating circumstances), cert. denied,    U.S.    , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012). It is something entirely different, however, to adhere to those requirements for purposes of jury selection, when counsel cannot possibly be expected to anticipate and prepare for any number of idiosyncratic responses by any number of venirepersons, or for the limitless number of reasons why opposing counsel might wish to exercise a peremptory challenge to strike any one or more of those venirepersons. I believe that we set a bad precedent by placing counsel in such an untenable position.[10]

Finally, even if it is improper for us to consider the National Geographic article in the context of the defendant's constitutional claim, in the present case, the defendant contends, as an alternative to that claim, that we should exercise our supervisory authority over the administration of justice to bar the use of racial self-identification as a justification for the exercise of a peremptory challenge. In support of this claim, the defendant relies on a number of policy considerations, including the importance of eradicating all forms of unfair discrimination and the need for diversity in our jury system. The defendant's supervisory authority claim, therefore, is not predicated or dependent on the fact-finding of the trial court in the present case; on the contrary, the defendant contends that we should adopt a new rule of general applicability, irrespective of the particular findings in this case, for reasons of public policy. Insofar as the National Geographic article might provide some insight into the broader issue of self-identification that animates the defendant's supervisory authority claim, this court should not preclude the defendant from furnishing it to this court for consideration of that claim. On the contrary, we should be free to consider it and to accord it whatever weight, if any, we deem appropriate.

For the foregoing reasons, I disagree with the majority's determination that it may not consider the National Geographic article that the defendant had submitted pursuant to Practice Book § 67-10. Because I agree, however, with the majority that the defendant cannot prevail on his claim for a new trial, I concur in the

judgment.

[1] This bar against invidious discrimination in the selection of jurors and the manner in which that prohibition is enforced are set forth in the majority opinion, and I do not repeat them here. Suffice it to say that this prohibition and the process to be used for enforcing the bar were first articulated by the United States Supreme Court in *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). As the majority explains; see footnote 16 of the majority opinion; that process is somewhat different under Connecticut law. See, e.g., *State* v. *Latour*, 276 Conn. 399, 408–10, 886 A.2d 404 (2005). That difference, however, has no material bearing on the issues presented by this appeal.

[2] Practice Book § 67-10 provides in relevant part: "When pertinent and significant authorities come to the attention of a party after the party's brief has been filed, or after oral argument but before decision, a party may promptly advise the appellate clerk of such supplemental authorities, by letter, with a copy certified to all counsel of record in accordance with Section 62-7. . . . The letter shall set forth the citations of the authorities. If the authority is an unreported decision, a copy of the text of the decision must accompany the letter. The letter shall concisely and without argument state the relevance of the supplemental citations and shall include, where applicable, reference to the pertinent page(s) of the brief. Any response shall be made promptly and shall be similarly limited.

"This section may not be used after oral argument to elaborate on points made or to address points not made."

[3] L. Funderburg, "The Changing Face of America," National Geographic, October, 2013, pp. 80–91.

[4] See *State* v. *Patterson*, 230 Conn. 385, 400, 645 A.2d 535 (1994) (exercising supervisory authority to direct that trial judges in criminal cases must be present during jury selection); *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166 (exercising supervisory authority to modify three step framework adopted in *Batson* v. *Kentucky*, 476 U.S. 79, 96–98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 [1986], by relieving defendant asserting *Batson* claim of burden of making initial prima facie showing of discrimination), cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

[5] The following articles and studies are among those to which the defendant cited, without objection by the state, in his initial brief and reply brief that he filed with this court: N. Khanna, "Multiracial Americans: Racial Identity Choices and Implications for the Collection of Race Data," 6 Soc. Compass 316 (2012); P. Linehan, "Thinking Outside of the Box: The Multiracial Category and Its Implications for Race Identity Development," 44 Howard L.J. 43 (2000); J. Rosato, " 'A Color of Their Own': Multiracial Children and the Family," 36 Brandeis J. Fam. L. 41 (1997–98); S. Sommers & M. Norton, "Race and Jury Selection: Psychological Perspectives on the Peremptory Challenge Debate," 63 Am. Psychologist 527 (2008); S. Townsend et al., "My Choice, Your Categories: The Denial of Multiracial Categories," 65 J. Soc. Issues 185 (2009); N. Angier, "Do Races Differ? Not Really, DNA Shows," N.Y. Times, August 22, 2000, p. F1; M. Fletcher, "Woods Puts Personal Focus on Mixed-Race Identity," Washington Post, April 23, 1997, p. A1; S. Saulny, "Black? White? Asian? More Young Americans Choose All of the Above," N.Y. Times, January 29, 2011, p. A1.

[6] I would reject the defendant's claims for the reasons set forth in the majority opinion.

[7] It seems odd to me that, on our own motion, we are precluding the defendant from submitting the National Geographic article, and, at the same time, we are free to consider the many similar articles that the defendant cited in his initial brief and reply brief. See footnote 5 of this opinion.

[8] I note that the National Geographic article had not even been published at the time of jury selection in the present case.

[9] *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[10] I also note that, as a consequence of the majority's decision, counsel who are confronted with a situation like that presented by this case may well need to seek an extension of time within which to complete jury selection to allow counsel adequate time to obtain the kind of legal support and authority, including, perhaps, expert testimony, for presentation to the trial court. Delays in jury selection will be inevitable because it would be unreasonable for the trial court to expect counsel to identify and obtain such legal support without additional time.