STATE OF CONNECTICUT *v.* MATTHEW
STEVEN JOHNSON
(SC 17190)

Borden, Palmer, Vertefeuille, Zarella and Damiani, Js.*

* The listing of justices reflects their seniority status as of the date of oral argument.

438

Argued March 7, 2007—officially released November 11, 2008

*Suzanne Zitser*, senior assistant public defender, for the appellant (defendant).

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *David Zagaja*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Matthew Steven Johnson, guilty of three counts of murder in violation of General Statutes § 53a-54a.[1] The trial court rendered judgments in accordance with the jury ver-

---

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

dicts,[2] and the defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3). On appeal, the defendant claims that the trial court improperly (1) granted the state's motion to consolidate for trial the three counts of murder upon concluding that the evidence of each murder was cross admissible as to the other two murders to prove both intent and a common plan or scheme, and (2) permitted the state to adduce expert testimony characterizing the three murders as serial killings. With respect to the defendant's first claim, we conclude that the defendant cannot prevail on his claim because the evidence was cross admissible to demonstrate propensity in accordance with our recent decisions in *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008), and *State* v. *Snelgrove*, 288 Conn. 742, 954 A.2d 165 (2008).[3] With respect to the defendant's second claim, we conclude that the trial court did not abuse its discretion in permitting the state to present the challenged expert testimony. Accordingly, we affirm the judgments of the trial court.

The following facts and procedural history are relevant to our determination of the defendant's claims. On the afternoon of April 16, 2000, the body of Aida Quinones, a thirty-three year old Hispanic female intravenous drug user[4] with an arrest record for prostitution, was discovered near an Interstate 84 overpass adjacent to Laurel Street in Hartford. Quinones' body was found lying facedown and covered with dirt and gravel. Her shirt and sweater had been pushed up to her chest, and

[2] The trial court imposed consecutive sentences of sixty years imprisonment on each of the three counts, for a total effective sentence of 180 years imprisonment.

[3] We therefore need not decide whether the trial court properly concluded that the evidence was admissible as to each murder count to establish intent or a common plan or scheme.

[4] An autopsy revealed the existence of multiple needle marks on Quinones' arms, as well as the presence of, inter alia, cocaine, morphine and methadone in her blood at the time of her death.

her pants had been pushed down and dangled from her left leg, revealing the lower portion of her naked torso. Although Quinones' right shoe had been removed and was found in the vicinity of her body, her left shoe remained on her left foot. The positioning of Quinones' arms and the abrasions on her back and buttocks indicated that she had been dragged a short distance to the location where her body was found.

An autopsy indicated that Quinones had died either on the night of April 15, 2000, or early the next morning. The medical examiner determined that Quinones had been murdered, and that the cause of death was blunt force trauma to the head and manual strangulation. The nature and severity of the injuries that had been inflicted to Quinones' head indicated that she may have been stomped to death.

Swab samples were taken from Quinones' oral, anal and vaginal cavities to test for the presence of DNA.[5] The vaginal swab tested positive for semen, which revealed the existence of at least two genetic profiles, one of which matched Quinones' profile and another of which matched the defendant's profile. The probability that an individual other than the defendant contributed to the DNA found in Quinones' vagina that matched the defendant's profile was determined to be approximately 1 in 39 million, 1 in 59 million and 1 in 46 million among the African-American, Caucasian and Hispanic populations, respectively.

About four and one-half months later, on August 29, 2000, the body of Rosali Jimenez, a thirty-two year old

[5] Forensic testing also was conducted on various items found near Quinones' body, including a pair of men's underwear, a state issued identification card bearing Quinones' name, a purse, a knife, a comb, a cigarette butt and drug paraphernalia. Dried blood was detected on the underwear, and subsequent forensic testing revealed the existence of two genetic profiles, one of which matched Quinones' profile and the other of which matched the profile of an unknown contributor.

Hispanic female drug user[6] with an arrest record for prostitution, was discovered in the basement of an abandoned building located at 50-52 Cedar Street in Hartford, approximately eight-tenths of one mile from the site where Quinones' body was found. As in the case involving Quinones, Jimenez' shirt had been pulled up, and her pants and underwear had been pulled down and dangled from her left leg, revealing the lower portion of her naked torso. Jimenez' right sneaker had been removed and was found near her body; her left sneaker remained on her left foot. Jimenez' head and face were covered in blood, and a bloody shoe print was found on her right arm.

An autopsy established that Jimenez had been murdered and that the cause of her death was blunt force trauma to the head and neck. Jimenez died on the night of August 28, 2000, or early the next morning.[7] The injuries inflicted on Jimenez' head and neck were consistent with forceful contact with a wall or the ground, and with the repeated stomping of a foot. Forensic testing conducted on Jimenez' oral and vaginal cavities indicated the presence of semen.[8] DNA testing revealed that the semen found in Jimenez' mouth matched the defendant's genetic profile, whereas the semen found

---

[6] An autopsy revealed the presence of cocaine and a byproduct of Prozac in Jimenez' blood at the time of her death.

[7] Orlando Ortiz, Jimenez' boyfriend, testified that he last had seen Jimenez at approximately 9 p.m. the night before her body was found. Ortiz' testimony, coupled with the results of the autopsy, established that Jimenez had died either on the night of August 28, 2000, or in the early morning hours of August 29, 2000.

[8] The police also conducted forensic testing on Jimenez' clothing, which revealed the presence of semen and blood on Jimenez' underwear. DNA testing indicated that the blood was consistent with Jimenez' genetic profile, whereas the semen exhibited a mixed profile. The defendant was excluded as a contributor of that semen. Semen also was detected in the crotch of Jimenez' pants. DNA testing of a portion of that semen revealed the presence of Jimenez' genetic profile; the remainder of the sample was insufficient for profiling.

in Jimenez' vagina did not. The probability that an individual other than the defendant contributed to the DNA found in Jimenez' mouth was determined to be approximately 1 in 205 million, 1 in 215 million and 1 in 195 million among the African-American, Caucasian and Hispanic populations, respectively. In addition, a dried, blood like substance was found under the fingernails of Jimenez' right hand. DNA testing of this substance revealed that it matched both Jimenez' and the defendant's genetic profiles. The probability that individuals other than Jimenez and the defendant contributed to these genetic profiles was determined to be approximately 1 in 11 million, 1 in 9 million and 1 in 5 million among the African-American, Caucasian and Hispanic populations, respectively.

About eleven months later, on July 22, 2001, the body of Alesia Ford, a thirty-seven year old African-American female drug user[9] with an arrest record for prostitution, was found next to the loading dock of an abandoned building located at 1 Myrtle Street in Hartford, approximately eight-tenths of one mile from the location where Quinones' body had been found and eight-tenths of one mile from the location where Jimenez' body had been found. Ford's body was discovered "semi-face up" near the corner of the building, with her head and face covered in blood. As in the cases involving Quinones and Jimenez, Ford's shirt had been pushed up, and her pants and underwear had been pulled down and dangled from her left leg, revealing the lower portion of her naked torso. Unlike in the cases involving Quinones and Jimenez, however, both of Ford's sneakers remained on her feet. A boot print was visible on the outside of Ford's T-shirt.

---

[9] An autopsy revealed the presence of, inter alia, ethyl alcohol and cocaine in Ford's blood at the time of her death. In addition, the lymph nodes at the bottom of Ford's liver were enlarged, a condition that is consistent with intravenous drug use.

An autopsy indicated that Ford had been murdered and that she likely had died in the late afternoon of July 21, 2001. The cause of death was determined to be blunt force trauma to the head and neck. Injuries that Ford had sustained to her throat established that she also had been manually strangled immediately prior to her death. Forensic testing revealed the presence of semen on Ford's abdomen and in her vagina, as well as the presence of a blood like substance on her chin.[10] DNA testing conducted on the semen found on Ford's abdomen indicated the presence of two genetic profiles, one of which matched the defendant's profile. The probability that an individual other than the defendant contributed to the genetic profile that matched that of the defendant in the foregoing samples was determined to be approximately 1 in 300 million among the general population. DNA testing conducted on the semen found in Ford's vagina also revealed the existence of two genetic profiles. The defendant could not be eliminated as a contributor of this semen. Finally, forensic testing conducted on the blood like substance found on Ford's chin revealed the existence of at least two genetic profiles, one of which matched the defendant's profile. The probability that the matching profile belonged to someone other than the defendant was determined to be approximately 1 in 41 million, 1 in 120 million and 1 in 300 million among the African-American, Caucasian and Hispanic populations, respectively.

[10] The presence of semen also was detected on Ford's underwear. Subsequent forensic testing revealed that the semen had been deposited by at least three unidentified male contributors. The defendant was excluded as a contributor of this semen. In addition, forensic testing was conducted on various items found at the scene of the crime, including a cigarette butt, which tested positive for the presence of saliva. DNA testing revealed a mixture of genetic profiles, one of which was consistent with the defendant's profile. The probability that that genetic profile was not the profile of the defendant was determined to be approximately 1 in 1.3 million among the African-American and Caucasian populations, and approximately 1 in 2.6 million among the Hispanic population.

On January 2, 2002, at the invitation of the police, the defendant voluntarily went to Hartford police headquarters for questioning. The defendant was advised of his rights in accordance with *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), shown a color photograph of Quinones, and asked whether he knew her. After studying the photograph for approximately one minute, the defendant responded that he did not know Quinones. The defendant then was asked if he could explain the presence of his semen in Quinones at the time of her death, and he could not do so. The defendant further stated that he had not had sexual intercourse with a woman since 1982.[11]

The defendant thereafter was arrested and charged with the murders of Quinones, Jimenez and Ford. The state filed a motion to consolidate the three murder counts for trial, claiming that, if the counts were to be tried separately, the evidence as to each murder would be admissible in the trial of the others under § 4-5 (b) of the Connecticut Code of Evidence.[12] In particular, the state maintained that the evidence of each murder was cross admissible to establish, inter alia, intent, identity, common plan or scheme, and motive. Alternatively, the state claimed that consolidation was appropriate under *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987), because the three murder counts

[11] At the time of the interview, the police were not aware of the link between the defendant's DNA and the bodies of the other two victims, Jimenez and Ford.

[12] Section 4-5 of the Connecticut Code of Evidence provides in relevant part: "(a) Evidence of other crimes, wrongs or acts inadmissible to prove character. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

"(b) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. . . ."

involved discrete and easily distinguishable factual sce-
narios, they were neither brutal nor shocking in compar-
ison to one another, and a consolidated jury trial would
not be unduly lengthy or complex. Defense counsel
objected to the state's motion for consolidation on the
grounds that the evidence of each murder was not cross
admissible and that a consolidated trial would be unduly
prejudicial to the defendant. After noting the distinct
similarities among the three murders, the trial court
granted the state's motion, concluding, ultimately, that
the evidence of each murder was cross admissible to
prove intent and a common plan or scheme.

At trial, Henry C. Lee, a forensic scientist and the
former state chief criminalist and director of the state
police forensic laboratory, testified as an expert on
behalf of the state. Lee reviewed the autopsy reports,
police reports, photographs and physical evidence that
investigators had gathered, and performed a partial
reconstruction of each crime scene. Lee characterized
the Quinones crime scene as a "primary crime scene"
with "two separate locations, in close-by vicinity." Lee
defined a "primary crime scene" as one in which the
victim is murdered in the same location where his or
her body is discovered. A primary crime scene has "two
separate locations, in close-by vicinity" when the victim
initially is assaulted in one location and the victim's
body subsequently is moved a short distance to another
location. Lee testified that the presence of a pool of
Quinones' blood found a short distance from her body,
the abrasions, gravel and soil found on Quinones' back
and buttocks, and the position of Quinones' limbs, all
led him to conclude that Quinones initially was as-
saulted in one location and subsequently dragged a
short distance to a different location, where she ulti-
mately was discovered.

Lee further testified that the presence of the defen-
dant's semen in Quinones' vagina, and the absence of

his semen from Quinones' pants, was significant. Lee explained that, typically, following vaginal intercourse, gravity will cause recently deposited semen to drain out of a woman's body and onto the fabric of her pants or underwear. Because the defendant's semen was found in Quinones' vagina but not on her pants, Lee indicated that Quinones had been killed after she had vaginal intercourse with the defendant but before she had an opportunity to put on her pants.

According to Lee, the Jimenez crime scene, like the Quinones crime scene, was a primary crime scene with two separate but nearby locations. Lee based his conclusion on the fact that Jimenez' shoe and some of her personal belongings were found a distance from the location where her body was discovered. Lee also indicated that the defendant's DNA, which was found in Jimenez' mouth and under her fingernails, was deposited shortly before Jimenez' death. Lee explained that semen deposited in an oral cavity degrades very quickly because of the large amount of bacteria and fungi found in the mouth, and is washed away very easily by drinking, eating or brushing one's teeth. Likewise, Jimenez' fingernails, which were relatively clean and very short, would not have retained biological material for very long.

Lee also testified that the Ford crime scene, like the Quinones and Jimenez crime scenes, was a primary crime scene with two separate locations. Lee reached this conclusion because Ford's blood was found on the wall located a short distance from where her body was discovered. Lee further stated that the defendant's DNA had been deposited on Ford's body shortly before her death. Lee explained that the semen found on Ford's abdomen was "relatively fresh" because it contained intact sperm, which typically degrade rapidly.

After Lee testified with respect to each individual murder, the assistant state's attorney asked him to con-

sider the three cases together and to explain the importance of any shared similarities. Lee testified that there were several significant similarities which, in his opinion, linked the three murders. First, each murder was committed in a publicly accessible yet "very secluded" location within a one mile radius in Hartford. Second, each of the three victims was a minority woman in her thirties with a history of prostitution and drug abuse. Third, each victim's clothing was positioned in a similar fashion: each victim's shirt had been pushed up, and her pants—and underwear in the cases of Jimenez and Ford—had been pulled down and left dangling off of her left leg, revealing the lower portion of her naked torso. Fourth, the victims had been killed in a similar manner: each victim died of blunt force trauma to the head and, in the cases of Jimenez and Ford, to the neck,[13] and each victim's body was discovered in the secondary location of a primary crime scene. Fifth, each crime scene could be categorized as "organized" and "active" because the killer individually selected his victim, lured her to an isolated location and murdered her in a brutal manner. Sixth, the defendant's DNA was found on or in each victim.

Lee also testified that, for purposes of forensic science, murders are classified by category depending on their distinguishing characteristics. Thus, if only one victim is murdered in a single instance, it is classified as a "single homicide." If, however, two victims are murdered in a single instance, it is classified as a "double homicide . . . ." If three or more victims are murdered in a single instance, it is classified as a "mass killing." Furthermore, if two or more separate murders appear to be unrelated, they are classified as "separate homicide[s]." If, however, two or more separate mur-

---

[13] In addition to Lee's testimony, H. Wayne Carver II, the state chief medical examiner, testified that all three victims had suffered similar injuries, and that those injuries had been inflicted by use of a similar degree of force.

ders appear to be related by the existence of certain similarities, including similar victims, along with the presence of a "cooling off period" between each murder, they are classified as "serial killing[s]." Finally, if two or more murders appear to be related by the existence of certain similarities but are committed in a short period of time, one after another, they are characterized as "continuous killing[s]." Over defense counsel's objection, Lee opined that, on the basis of his extensive experience and training, the Quinones, Jimenez and Ford murders were consistent with the forensic definition of the term "serial killings."

Following the close of evidence and final arguments of counsel, the trial court instructed the jury that, in considering each separate murder count, it could consider evidence of the other murders for two purposes only: to determine (1) "whether there is a characteristic method in the commission of [the] criminal acts or modus operandi"; and (2) "the existence of . . . intent, which is a necessary element of the crime charged." Thereafter, the court explained that "characteristic method" means a common plan or scheme in the commission of the crimes.[14] The trial court also emphasized, however, that the jury was required "to consider each charge or count separately." The court further cautioned the jury: "You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider the evidence if you believe it and further find [that] it logically, rationally and conclusively supports the issues

---

[14] In explaining common plan or scheme, the court stated: "[T]he marks which the charged and the uncharged crimes have in common must be such that it can be logically inferred that, if the defendant is guilty of one, then [he is] guilty of the other, and [that is] the purpose [for which] you can consider them. But, before you can consider them like that, you have to be satisfied that the similarities are such that they justify the inference . . . that I just described."

for which [it is] being offered by the state, but only as it may bear . . . on the issues of a characteristic method of committing criminal acts or the question of intent. If you do not believe such evidence, or even if you do, if you find [that] it [does] not logically, rationally and conclusively support the issues for which [it is] being offered by the state, then you may not consider the testimony for any purpose except in the charged crime itself. In other words, you may not, just because [you are] convinced beyond a reasonable doubt that the defendant committed the crime charged in one count, use that conclusion to find that [he is] a bad person, and, therefore, more likely to have committed the crimes charged in the other counts. That you cannot do."[15] Defense counsel excepted to this portion of the

[15] In addition, prior to Lee's testimony, the trial court instructed the jury in relevant part: "I told you at the start of the case that the reason we were trying all three murder charges in one trial was because the jury was going to hear at any one of the cases evidence about the other two crimes, even if they [were not] charged crimes. And so I did tell you at the start of the case that, after I heard the evidence, I would tell you for the limited purpose that you can consider the evidence of the other crimes.

"Now, [that is] a little complicated because [you are] going to be deciding . . . in three separate deliberations . . . whether the state has proved beyond a reasonable doubt the elements of the crime of murder in the case of . . . Quinones, and then separately in the case of . . . [Jimenez], and separately again in the case of . . . Ford. However, in considering any one charge of murder, you are entitled to consider the evidence of the other two for two limited purposes only, and [I will] tell you this again in my final charge. One is on the question of intent, and, secondly, on the question of whether all three events were a part of a common scheme or a common plan. Now, to do that, you will have to decide whether there are sufficient similarities in the three cases to justify the inferences that would flow from finding that there was a common scheme or that there was a common intent—strike that. Not that there was a common intent, but that there was—that you can consider them on intent.

"Now, what you may not do is consider that because, if you do decide that the [state has] proved the elements of a particular charge, you may not then conclude that the defendant must be a bad person and more likely to commit the other crimes. That you may not do. We do not admit this evidence for propensity. It's for the limited purpose of whether . . . the evidence satisfies you that [there is] a common plan here or a common scheme or a modus operandi, if you will, or—and you may also consider it on the

jury instructions on the ground that, inter alia, the evidence of each murder was not cross admissible to establish either intent or common plan or scheme.

Thereafter, the jury found the defendant guilty of each of the three murder charges. This appeal followed.

I

The defendant first claims that the trial court improperly granted the state's motion to consolidate the three murder counts upon concluding that the evidence as to each count was admissible as to the other two counts under the intent and common plan or scheme exceptions to the general rule barring the use of evidence of other crimes. We need not decide whether the evidence was properly admitted to prove intent or a common plan or scheme because we conclude that the evidence was cross admissible to demonstrate propensity in accordance with our recent decisions in *State* v. *DeJesus*, supra, 288 Conn. 470–71, and *State* v. *Snelgrove*, supra, 288 Conn. 758–61,[16] both of which were issued while this appeal was pending.[17]

question of intent, but for those purposes and only for those purposes. You still must deliberate independently on the three separate charges. And [I will], as I said, give you more about that in my final charge." The trial court generally reiterated this instruction in a supplemental charge that the court gave in response to a question posed by the jury during its deliberations.

[16] As this court repeatedly has observed, if a trial court reaches a correct decision but on mistaken grounds, an appellate court will sustain the trial court's action if proper grounds exist to support it. E.g., *State* v. *Colon*, 272 Conn. 106, 187–88, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). As we have indicated, in the present case, we do not reach the issue of whether the trial court properly determined that the evidence of each murder was cross admissible to prove intent and common plan or scheme because that evidence was admissible under *DeJesus* and *Snelgrove* to establish propensity.

[17] "[J]udgments rendered in decisions that are not limited by their terms to prospective application in other cases usually are applied retroactively to other cases pending at the time." (Internal quotation marks omitted.) *State* v. *Snelgrove*, supra, 288 Conn. 758 n.8.

We commence our review of the defendant's claim by summarizing the law applicable to the consolidation of similar charges in pending cases against the same defendant. "General Statutes § 54-57[18] and Practice Book § 41-19[19] permit a trial court to join similar charges in pending cases against a common defendant. Our prior decisions have made clear that the trial court enjoys broad discretion in this respect and that its decision to consolidate will not be disturbed in the absence of manifest abuse of that discretion. *State* v. *McKenzie-Adams*, 281 Conn. 486, 519–20, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007). [T]his court consistently has recognized a clear presumption in favor of joinder and against severance . . . and, therefore, absent an abuse of discretion . . . will not second guess the considered judgment of the trial court as to the joinder or severance of two or more charges. . . . Id., 521. On appeal, [t]he defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions. . . . Id., 520.

"[When] evidence of one incident can be admitted at the trial of the other, separate trials would provide [a] defendant no significant benefit. It is clear that, under such circumstances, [a] defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987). We consistently have found joinder to be proper if we have concluded that the evidence of

[18] General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise."

[19] Practice Book § 41-19 provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

other crimes or uncharged misconduct would have been cross admissible at separate trials. *State* v. *McKenzie-Adams*, supra, 281 Conn. 520 (citing cases); see also *State* v. *Atkinson*, 235 Conn. 748, 765, 670 A.2d 276 (1996) (concluding that consolidation was proper, in part, because evidence of escape offense would have been admissible at trial to prove consciousness of guilt of other factually unrelated offenses); *State* v. *Greene*, 209 Conn. 458, 464, 551 A.2d 1231 (1988) ([t]he trial court properly joined the two cases for trial because, in the event of separate trials, evidence relating to each of the cases would have been admissible in the other); *State* v. *Pollitt*, supra, 72." (Internal quotation marks omitted.) *State* v. *Sanseverino*, 287 Conn. 608, 628–29, 949 A.2d 1156 (2008).

With these principles in mind, we turn to the law governing the admissibility of propensity evidence. "We recently have adopted an exception to § 4-5 (a) of the Connecticut Code of Evidence . . . allowing the admission of prior misconduct evidence to establish propensity in sex related cases if certain conditions are met. See *State* v. *DeJesus*, [supra, 288 Conn. 470–74]. Specifically, we concluded in *DeJesus* that evidence of uncharged sexual misconduct is admissible only if it is relevant to prove that [a] defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she [was] charged. Relevancy is established by satisfying the liberal standard pursuant to which evidence previously was admitted under the common scheme or plan exception. Accordingly, evidence of uncharged misconduct [or other crimes] is relevant to prove that [a] defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed [against] persons similar to the prosecuting witness. . . .

"[Such] [e]vidence . . . is admissible only if its probative value outweighs the prejudicial effect that invariably flows from its admission. . . . In balancing the probative value of such evidence against its prejudicial effect, however, trial courts must be mindful of the purpose for which the evidence is to be admitted, namely, to permit the jury to consider a defendant's prior bad acts in the area of sexual abuse or child molestation for the purpose of showing propensity. . . .

"Finally, we concluded in *DeJesus* that the admission of evidence of uncharged sexual misconduct . . . must be accompanied by an appropriate cautionary instruction to the jury to minimize the risk of undue prejudice to the defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Snelgrove*, supra, 288 Conn. 758–59.

Moreover, in *Snelgrove*, we also considered "whether [the] new rule allowing the admission of propensity evidence in sex related cases [that we adopted in *DeJesus*] may be applied when [a] defendant has not been charged with a sexual offense." Id., 759–60. We concluded that it may be. Id., 760. "In *DeJesus*, we explained that the admission of propensity evidence in sex related cases is supported by two public policy considerations. [F]irst, in sex crime cases generally . . . the offense often is committed surreptitiously, in the absence of any neutral witnesses. Consequently, courts allow prosecutorial authorities greater latitude in using prior misconduct evidence to bolster the credibility of the complaining witness and to aid in the obvious difficulty of proof. . . . Second, because of the unusually aberrant and pathological nature of the crime of child molestation, prior acts of similar misconduct, as opposed to other types of misconduct, are deemed to be highly probative because they tend to establish a necessary motive or explanation for an otherwise

inexplicably horrible crime . . . and [to] assist the jury in assessing the probability that a defendant has been falsely accused of such shocking behavior. . . . Moreover, [i]t is inherently improbable that a person whose prior acts show that he is in fact a rapist or child molester would have the bad luck to be later hit with a false accusation of committing the same type of crime or that a person would fortuitously be subject to multiple false accusations by a number of different victims . . . ." (Citation omitted; internal quotation marks omitted.) Id.

In *Snelgrove*, we concluded that "this rationale for the exception to the rule barring propensity evidence applies whenever the evidence establishes that both the prior misconduct and the offense with which the defendant is charged were driven by an aberrant sexual compulsion, regardless of whether the prior misconduct or the conduct at issue resulted in sexual offense charges. Although we stated in *DeJesus* that [t]he scope and contours of the propensity [doctrine] . . . [are] rooted in this state's unique jurisprudence concerning the admission of . . . misconduct evidence *in sex crime cases*, and must be construed accordingly . . . nothing in [*DeJesus*] suggest[ed] that it is the specific nature of the charges brought against a defendant that renders the evidence especially probative in such cases. Rather, *DeJesus* [made] it clear that it is the aberrant and compulsive nature of [a] defendant's prior misconduct that permits a fact finder to infer that, because [that] defendant previously had engaged in such conduct, it is likely that he did so again. As a matter of pure logic, this rationale applies whenever the state is using the evidence of prior sexual proclivities to establish a necessary motive or explanation for an otherwise inexplicably horrible crime . . . regardless of whether the crime itself was a sexual offense. Because . . . the . . . sexual proclivities [of the defendant in *Snelgrove*]

clearly were aberrant and compulsive, and the state [in that case] sought to introduce evidence of those proclivities to explain why [he] murdered the victim, we conclude[d] that our newly adopted rule allowing propensity evidence in sex related cases applie[d] even though the defendant [in *Snelgrove*] was not charged with a sex offense." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 760–61.

We conclude that the evidence adduced as to each murder in the present case satisfies the standard established by this court in *DeJesus* to demonstrate propensity. First, the Quinones, Jimenez and Ford murders were not remote in time. Jimenez was murdered approximately four and one-half months after Quinones was murdered, and Ford was murdered approximately eleven months after Jimenez. Because the three murders occurred within about fifteen months of each other, they were sufficiently proximate in time. Cf. *State v. Sanseverino*, supra, 287 Conn. 632 (period of approximately one year between acts of prior sexual misconduct fell well within range of time this court has accepted as not too remote for purposes of establishing common plan or scheme in sexual assault cases). Second, each of the three murders shared significant similarities: (1) the defendant had sexual relations with each victim around the time of her death; (2) each victim died of blunt force trauma to the head; (3) each victim was found with her shirt pushed up and her pants pulled down and left dangling off of her left leg, revealing the lower portion of her naked torso; (4) each murder occurred in a publicly accessible yet secluded location within a one mile radius in Hartford; and (5) each victim's body was discovered in the secondary location of a primary crime scene, and each crime scene could be categorized as organized and active. Finally, each of the three victims was a minority woman in her thirties with a history of prostitution and drug abuse. The three murders, therefore, were not remote in time, and were

committed in a similar manner against similar victims. Consequently, they meet the standard of admissibility set forth in *DeJesus* for use as propensity evidence.

Although the defendant was not charged with a sexual offense, the evidence revealed that each victim had been killed during the course of, or immediately following, sexual relations. The murders also appeared to be sexually related because the victims were found with some of their clothing removed and their genitalia exposed. Each victim, moreover, had a history of prostitution. As in *Snelgrove*, the state in the present case introduced evidence of similar sexual misconduct by the defendant to explain the defendant's motive for committing an otherwise inexplicably brutal and horrible set of crimes.[20] Because the defendant's violent sexual proclivities clearly were aberrant and compulsive, we conclude, as we did in *Snelgrove*, that "our newly adopted rule allowing propensity evidence in sex related cases applies even though the defendant [in the present case] was not charged with a sex offense." *State* v. *Snelgrove*, supra, 288 Conn. 761.

"Because the [other crimes] evidence was admitted pursuant to the [intent and] common scheme or plan exception[s], rather than the propensity exception, [however] we must address the issue of harm."[21] *State*

---

[20] The defendant's sexual involvement with each of the victims immediately before the defendant killed them, coupled with the brutal nature of those killings and the sexually explicit and ritualistic manner in which he left the victims' bodies, is strong indication of an inextricable link between the defendant's sexual conduct and the three murders. In the particular circumstances of this case, therefore, the trial court reasonably could have concluded that such a connection warrants an inference that the defendant was a sexual sadist who was driven to murder his victims by virtue of his compulsive and aberrant proclivities.

[21] "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . As we recently have noted, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Randolph*, 284 Conn. 328, 363, 933 A.2d 1158 (2007).

v. *DeJesus*, supra, 288 Conn. 475–76. In the present case, even if the evidence of each murder was not cross admissible to prove intent or a common plan or scheme, the only potential harm that could arise from the admission of that evidence for either of those purposes was that the jury could infer that, because the defendant previously had killed women in the course of satisfying his sexual proclivities, he had done so again. Under *DeJesus* and *Snelgrove*, however, that evidence is admissible for that purpose. See *State* v. *Snelgrove*, supra, 288 Conn. 766; *State* v. *DeJesus*, supra, 476. Accordingly, even if we assume that the evidence was improperly admitted for other purposes, any impropriety was harmless.[22] *State* v. *Snelgrove*, supra, 766; *State* v. *DeJesus*, supra, 476.

Because the evidence of each murder was admissible to prove the commission of the other two murders, the defendant was not entitled to separate trials on each of the three murder counts. Consequently, the defendant cannot prevail on his claim that a new trial is required as a result of the consolidation of the three counts for trial.

II

The defendant next claims that the trial court improperly permitted Lee to testify that the Quinones, Jimenez

[22] "We recognize that the trial court [in the present case] did not instruct the jury on the proper use of [the misconduct] evidence . . . to establish propensity, as . . . *DeJesus* [requires]. . . . As in *DeJesus*, however, we conclude that the instruction[s] given by the trial court minimized any risk that the jury would rely solely on the . . . misconduct evidence in considering whether the defendant committed the charged offense[s] or that it would convict him in order to punish him for the [other] misconduct." (Citation omitted.) *State* v. *Snelgrove*, supra, 288 Conn. 764 n.10. Furthermore, to the extent that the defendant contends that the trial court abused its discretion in concluding that the probative value of the other crimes evidence was outweighed by its prejudicial effect, we also reject that claim because the trial court's instructions sufficiently reduced any risk of undue prejudice to the defendant.

and Ford murders were "serial killings" connected by the presence of the defendant's DNA at each crime scene because that testimony (1) embraced an ultimate issue of fact, namely, the identity of the perpetrator of the murders, in violation of § 7-3 of the Connecticut Code of Evidence,[23] and (2) was irrelevant and unduly prejudicial.

The following additional procedural history is necessary for our resolution of these claims. On January 20, 2004, the defendant filed a motion, pursuant to Practice Book § 40-11 (a) (4),[24] for the production of a supplemental report detailing the substance and basis of Lee's expert opinions or, alternatively, to preclude Lee's testimony. The defendant claimed that Lee's initial report was inadequate because it was "merely a summary of facts expected to be offered by the state at trial, and . . . [contained] no expert analysis, conclusions, or opinions concerning the reconstruction of the crime scenes where [the bodies of Quinones, Jimenez and Ford] were found." The defendant therefore claimed

---

[23] Section 7-3 of the Connecticut Code of Evidence provides in relevant part: "(a) General rule. Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that . . . an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue. . . ."

[24] Practice Book § 40-11 (a) provides in relevant part: "Upon written request by a defendant filed in accordance with Section 41-5 and without requiring any order of the judicial authority the prosecuting authority, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing the existence of and allow the defendant in accordance with Section 40-7, to inspect, copy, photograph and have reasonable tests made on any of the following items:

\* \* \*

"(4) Any reports or statements of experts made in connection with the offense charged including results of physical and mental examinations and of scientific tests, experiments or comparisons which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial . . . ."

that a supplemental report was necessary "to enable the defense . . . to prepare an adequate response" to Lee's anticipated testimony. The defendant claimed, alternatively, that, if Lee's initial report was deemed adequate to "[represent] the substance of any testimony [that Lee] might provide at trial," Lee's expert testimony was not admissible under § 7-2 of the Connecticut Code of Evidence[25] because such testimony would offer "no insight . . . beyond the capability of ordinary lay persons to understand [the evidence] and would not assist the trier of fact in understanding the evidence or in determining a fact in issue." (Internal quotation marks omitted.)

The trial court subsequently conducted a hearing on the defendant's motion. At that time, defense counsel conceded that Lee's initial report contained expert conclusions insofar as it characterized the murders of Quinones, Jimenez and Ford as "serial killings." Defense counsel maintained, however, that Lee's initial report was conclusory in nature and lacked a factual basis. The trial court denied the defendant's motion, concluding that Lee's initial report was adequate to notify the defense of the substance and basis of Lee's anticipated testimony.

Thereafter, defense counsel sought to preclude Lee from using the terms "serial killer," "serial killings" or "serial homicide" in his testimony. Defense counsel claimed that, although it was "entirely appropriate for . . . Lee to talk about two or more related cases involving homicid[al] behavior and to describe how he believes [that] they are related, the term 'serial killer,' or

---

[25] Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

'serial killings' or 'serial homicide' [was] not necessary to his testimony and carrie[d] with it connotations that are broader than the technical definition that a forensic scientist might use." Defense counsel essentially claimed that the probative value of Lee's use of the aforementioned terms was outweighed by its prejudicial effect. The trial court denied defense counsel's request. Thereafter, Lee testified that, in his opinion, the murders of Quinones, Jimenez and Ford were "serial killings," as that term is defined in forensic science, because each crime scene shared significant similarities, one of which was the presence of the defendant's DNA, and because the murders were separated by a cooling off period.

### A

We first address the defendant's claim that the trial court improperly permitted Lee to testify concerning an ultimate issue of fact in violation of § 7-3 of the Connecticut Code of Evidence. We decline to review this claim because our review of the record reveals that it was not raised in the trial court and, therefore, was not preserved for our review.

"We have stated that [t]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush. . . . *State* v. *Cabral*, 275 Conn. 514, 530–31, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005); id., 531 (declining to review claim that tape-recorded statements were inadmissible under coconspirator hearsay exception when objection at trial was on different ground that listener was acting as agent of police when statements were made); see also Practice Book § 5-5."[26] (Internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 645–46, 945 A.2d 449 (2008); see also *Council* v. *Commissioner of Correction*, 286 Conn. 477, 498, 944 A.2d 340 (2008) (" '[A] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . . For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party.' ").

Our review of the record reveals that, although defense counsel objected to the admission of Lee's testimony on various grounds, he failed to make the claim that the defendant now raises on appeal, namely, that Lee's testimony encompassed an ultimate issue of fact and that it, therefore, was inadmissible under § 7-3 of the Connecticut Code of Evidence. Accordingly, we will

[26] Practice Book § 5-5 provides: "Whenever an objection to the admission of evidence is made, counsel shall state the grounds upon which it is claimed or upon which objection is made, succinctly and in such form as he or she desires it to go upon the record, before any discussion or argument is had. Argument upon such objection or upon any interlocutory question arising during the trial of a case shall not be made by either party unless the judicial authority requests it and, if made, must be brief and to the point."

not review the defendant's unpreserved evidentiary claim.[27]

## B

The defendant next claims that the trial court improperly allowed Lee to characterize the Quinones, Jimenez and Ford murders as "serial killings" connected by the presence of the defendant's DNA because this testimony was irrelevant and unduly prejudicial. We disagree.

"The law defining the relevance of evidence is well settled. Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . The trial court has wide discretion to determine the relevancy of evidence . . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *Hayes* v. *Camel*, 283 Conn. 475, 483, 927 A.2d 880 (2007). "One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evi-

---

[27] For the first time in his reply brief, the defendant requests that this court review his claim under the plain error doctrine. See Practice Book § 60-5 ("The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court."). It is well established, however, that "[c]laims, including requests for plain error review, are unreviewable when raised for the first time in a reply brief. . . . Our practice requires an appellant to raise claims of error in his original brief, so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error." (Citations omitted; internal quotation marks omitted.) *Grimm* v. *Grimm*, 276 Conn. 377, 393–94 n.19, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006). We therefore decline to review the defendant's claim of plain error.

dence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, [as] long as it is not [unfairly] prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Skakel,* 276 Conn. 633, 734–35, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); see also Conn. Code Evid. § 4-1.

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jur[ors]. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Wargo,* 255 Conn. 113, 141–42, 763 A.2d 1 (2000); see also Conn. Code Evid. § 4-3.

In the present case, the state's theory of the case was that Quinones, Jimenez and Ford each had been murdered by the same individual, and that individual was the defendant. "It is black letter law that in any criminal prosecution, the state bears the burden of proving beyond a reasonable doubt the defendant's identity as [the perpetrator or] one of the perpetrators of the crime charged." *State* v. *Smith*, 280 Conn. 285, 302, 907 A.2d 73 (2006). Contrary to the defendant's claim, Lee's testimony that the murders of Quinones, Jimenez and Ford were "serial killings" connected by the presence of the defendant's DNA at each crime scene clearly was relevant to the state's theory of the case and to the issue of identity.

We also conclude that the trial court did not abuse its discretion in determining that the probative value of Lee's testimony outweighed its prejudicial effect. We recognize that the terms "serial killer" and "serial killings" are likely to be inflammatory when used colloquially. In the present case, however, Lee provided the jury with the definition of the term "serial killings" as it is used in the field of forensic science. Lee then explained why the murders of Quinones, Jimenez and Ford satisfied that forensic definition. Moreover, Lee was subject to cross-examination concerning his definition of the term and his reasons for its applicability to the present case. In addition, because the trial court previously had concluded that the evidence of the three murders was cross admissible, the jury already was aware of the many similarities that the murders shared, including the fact that the defendant's DNA had been discovered at each of the three crime scenes. Indeed, in light of our conclusion that the evidence of the three sexually related murders was cross admissible to establish the defendant's propensity to commit them, Lee's testimony about the serial nature of the crimes necessarily was less prejudicial than it otherwise would have

been if propensity were not a proper consideration. In view of the nature and context of Lee's testimony with respect to his opinion that the three murders satisfied the forensic definition of the term "serial killings," we are not persuaded that the trial court abused its broad discretion in permitting the state to adduce that testimony.

The judgments are affirmed.

In this opinion the other justices concurred.