******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v*. BARRY J. SMITH
(SC 19007)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued February 18—officially released August 26, 2014*

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Terence D. Mariani*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Barry J. Smith, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder in violation of General Statutes § 53a-54a (a)[1] and one count of felony murder in violation of General Statutes § 53a-54c.[2] The defendant claims that the trial court improperly (1) admitted evidence of uncharged sexual misconduct, (2) rejected his claim that he was denied a fair trial under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), because the state failed to disclose an alleged agreement or understanding with a key witness that she would be given a benefit if she testified for the state, and (3) permitted the senior assistant state's attorney (prosecutor) to exercise a peremptory challenge with respect to an African-American venireperson in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 96–97, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On March 21, 1999, a tenant at 17 Burton Street in the city of Waterbury went to the basement to retrieve his bicycle and discovered the partially clothed body of the victim, Michelle McMaster, lying on the floor. A police investigation later determined that the cause of the victim's death was asphyxia by manual strangulation and that the evidence also was consistent with a sexual assault.

The perpetrator of the crime was not immediately found. In the years that followed, the police suspected that a drug user, Donna Russell, who often associated with a group that included the defendant and the victim, might have information about the crime, but Russell repeatedly refused to cooperate until January, 2008.[3] At that time, she told investigators at the Waterbury Police Department that she was in the basement of 17 Burton Street, a local drug hangout, on the evening of March 20, 1999, for the purpose of using heroin when she saw the victim arguing with Lawrence Andrews, whom Russell later identified from a photographic array, over the victim's refusal to give Andrews drugs or money. Russell also saw two other men standing near the victim, one of whom she knew and later identified from a photographic array as the defendant. Russell was familiar with the defendant and Andrews because they sold drugs in the neighborhood and she had bought drugs from the defendant many times before. The third man was someone she did not know.

In July, 2008, a DNA sample from a vaginal swab used in examining the victim's body was found to match a DNA sample from a man named Orenthain Daniel. Thereafter, in March, 2009, when the police presented Russell with a photographic array, she identified Daniel as the third man in the basement with Andrews and

the defendant. She also provided the police with more information regarding what she had seen.

Russell elaborated that the argument between Andrews and the victim over her refusal to give him drugs or money escalated to the point where the victim was knocked to the ground and Andrews started to choke her. Given these developments, Russell became frightened and decided to flee. As she started to leave, she heard the victim gasping for air and pleading for help, but Russell was afraid of Andrews and his friends, feared for her safety, and ignored the victim's pleas. The last thing she saw as she fled from the basement was Andrews choking the victim, the defendant holding down her arms, and Daniel pulling down her pants. When Russell ran into Andrews a short time later, he threatened her and told her never to say anything about what had happened that evening.

Additional evidence was provided to the police by Norman Reynolds.[4] Reynolds had used drugs with the defendant in the early to mid-1990s, and his wife was the defendant's first cousin. During the summer of 1999, a few months after the victim's murder, Reynolds encountered the defendant at the Brooklyn Correctional Institution, where both men were incarcerated and sometimes socialized. On one occasion, after the defendant received a visit from his girlfriend, he seemed disturbed and "paranoid . . . ." He later confided in Reynolds that he had killed the victim but did not implicate anyone else. According to Reynolds, the defendant told him that he had been in the basement with Andrews and another man named Marvin Slade, and that the men had given the victim drugs in exchange for sex. Afterward, the three men left the basement and engaged in several drug transactions. The defendant then returned to the basement for more drugs or money, "[got] high" with the victim instead, and started to have sex with her again while wearing a condom. The defendant told Reynolds that, when the victim resisted, he began punching, strangling and choking her, and that her death was accidental.

In March, 2009, largely on the basis of the evidence provided by Russell and Reynolds, as well as the DNA results, the defendant was arrested and charged, initially with felony murder, and subsequently with both murder and felony murder.[5] The defendant entered a plea of not guilty and elected a jury trial. After one day of deliberations during which the jury requested a playback of Russell's testimony, the jury returned a verdict of guilty as to both counts, and the court rendered judgment sentencing the defendant to a term of sixty years incarceration. This appeal followed.

I

The defendant first claims that the trial court improperly admitted evidence that he engaged in uncharged

sexual misconduct similar to the charged crime shortly after the victim's murder. Although the defendant acknowledges that evidence of other sexual misconduct is admissible in a case involving a sex crime if the misconduct in both incidents is similar, he contends that the charged and uncharged misconduct in the present case does not satisfy the test established in *State* v. *DeJesus*, 288 Conn. 418, 476, 953 A.2d 45 (2008), for admission of such evidence, and that, even if it satisfies the *DeJesus* test, the evidence was unduly prejudicial. The state responds that the trial court properly admitted the uncharged misconduct evidence and that the evidence was not unduly prejudicial. We agree with the state.

The following additional facts are relevant to our resolution of this claim. Approximately one week before commencement of trial, the state learned from Russell that Yvonne Readus, who was known to Russell as the defendant's "girlfriend," might be able to provide evidence that the defendant had engaged in uncharged sexual misconduct around the time of the murder similar to the conduct that resulted in the victim's death. Readus subsequently stated in an interview with the Office of the State's Attorney and testified at trial that she had met the defendant while she was using and selling drugs and that the defendant would sometimes supply her with drugs. She also stated that, although she thought she was the defendant's "girl," she "knew he already had a girl that he lived with," and she described her relationship with the defendant at another point in her testimony as a "drug and sex relationship . . . ."

With respect to the uncharged misconduct, Readus stated in her interview and also subsequently testified that, a short time before she learned that the victim had been murdered, the defendant stopped by her house with a woman in his car, which caused Readus to become angry and begin arguing with the defendant.[6] The defendant eventually left but returned to her house later that evening. Readus remained angry, however, and the two continued to argue. As the argument became more heated, the defendant grabbed Readus by the neck, threw her down on the couch and sexually assaulted her. During the assault, he choked her as she struggled to push him off. The defendant left after he finished assaulting her, and they had no further contact until she saw him at trial.

Following the interview with Readus, the state filed a notice of intent to offer evidence regarding the incident for purposes of showing propensity, identity and intent because it involved choking during a sexual assault around the same time the defendant had participated in a similar assault against the victim. The trial court held a pretrial hearing on the matter, during which defense counsel objected to admission of the proposed

evidence. Defense counsel argued that neither the misconduct nor the victims in the charged and uncharged misconduct was sufficiently similar to admit the evidence under the test set forth in *DeJesus*. The state focused on the testimony of Reynolds and argued that, because the defendant's description to Reynolds of his sexual assault and choking of the victim was almost identical to the proposed misconduct testimony of Readus, the evidence was admissible under *DeJesus*. The court subsequently concluded that the evidence was admissible to show identity and intent. The court also concluded that the evidence was admissible to show propensity. It explained that the uncharged misconduct was not too remote in time to the charged crime and that they were sufficiently similar because the uncharged misconduct constituted sexual assault in the first degree whereas one of the qualifying felonies for the charged crime was sexual assault as a principal and accessory. In addition, the victims were similar in age[7] and ethnicity, and in their prior sexual contact with the defendant and their unwillingness to comply with the defendant's demands, which had resulted in sexual violence.[8] The court also determined that evidence of the uncharged misconduct would not be unduly prejudicial because it was similar to the charged crime and any potential prejudice could be minimized by restricting Readus' testimony to a "bare bones" account of what had happened and by immediately giving a limiting instruction to the jury. Readus thus testified briefly at trial regarding the incident, after which the court gave a limiting instruction. The court also gave a similar instruction during its final jury charge.

We begin with the standard of review and the applicable legal principles. Generally, "[e]vidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime. . . . Exceptions to this rule have been recognized, however, to render misconduct evidence admissible if, for example, the evidence is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime." (Internal quotation marks omitted.) *State* v. *Pena*, 301 Conn. 669, 673, 22 A.3d 611 (2011); see also Conn. Code Evid. § 4-5 (a) and (b). In cases involving uncharged sexual misconduct, we apply a more liberal standard. See, e.g., *State* v. *Snelgrove*, 288 Conn. 742, 758–59, 954 A.2d 165 (2008). Under this standard, prior misconduct evidence may be admitted to establish propensity in sex related cases if certain conditions are met. See, e.g., *State* v. *DeJesus*, supra, 288 Conn. 470–74, 476. As we explained in *DeJesus*, "evidence of uncharged sexual misconduct is admissible only if it is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged. Relevancy

is established by satisfying the liberal standard pursuant to which evidence previously was admitted under the common scheme or plan exception. Accordingly, evidence of uncharged misconduct is relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed upon persons similar to the prosecuting witness." (Internal quotation marks omitted.) Id., 473.

We further explained in *DeJesus* that the admission of propensity evidence in sex related cases is supported by certain public policy considerations, one of which is that "in sex crime cases generally . . . the offense often is committed surreptitiously, in the absence of any neutral witnesses. Consequently, courts allow prosecutorial authorities greater latitude in using prior misconduct evidence to bolster the credibility of the complaining witness and to aid in the obvious difficulty of proof." (Internal quotation marks omitted.) Id., 468–69. We added that "[i]t is inherently improbable that a person whose prior acts show that he is in fact a rapist . . . would have the bad luck to be later hit with a false accusation of committing the same type of crime or that a person would fortuitously be subject to multiple false accusations by a number of different victims . . . ." (Internal quotation marks omitted.) Id., 470.

If the evidence of sexual misconduct is admissible under this standard, a determination also must be made that "its probative value outweighs the prejudicial effect that invariably flows from its admission." (Internal quotation marks omitted.) Id., 473. "[T]o minimize the risk of undue prejudice to the defendant, the admission of evidence of uncharged sexual misconduct under the limited propensity exception . . . must be accompanied by an appropriate cautionary instruction to the jury." (Internal quotation marks omitted.) Id., 474.

It is well established that we "review the trial court's decision to admit evidence . . . for an abuse of discretion." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). "When reviewing claims under an abuse of discretion standard, the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *Arthur H.*, 288 Conn. 582, 595, 953 A.2d 630 (2008). "[T]he question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Cancel*, 275 Conn. 1, 18, 878 A.2d

1103 (2005).

In the present case, the defendant claims that the uncharged misconduct evidence fails to satisfy the second prong of *DeJesus* because the defendant is charged with holding the victim down while Andrews robbed and strangled her and Daniel sexually assaulted her, whereas the uncharged misconduct consisted of the defendant's momentary choking and sexual assault of Readus. The defendant also claims that the victim and Readus are dissimilar under the third prong of *DeJesus* because the victim was a prostitute who had a commercial sexual relationship with the defendant, whereas Readus was the defendant's girlfriend with whom he had a romantic sexual relationship.[9] The state responds that the trial court properly admitted the uncharged misconduct evidence because it could have found the uncharged misconduct sufficiently similar in all respects to the charged crime and the evidence was not unduly prejudicial. We agree with the state.

A

We first conclude that the trial court properly determined that the charged crime and uncharged misconduct were sufficiently similar under the second prong of *DeJesus* because both acts involved a sexual assault during which the victim was choked as she resisted her attacker. This is true regardless of whether the court relied on the testimony of Russell, the eyewitness who stated that she saw Andrews choking the victim, Daniel pulling down the victim's pants, and the defendant holding down the victim's arms, or on the testimony of Reynolds, the jailhouse informant who testified that the defendant admitted that he had started to punch and choke the victim when she resisted the sexual assault and had accidentally killed her.

The misconduct evidence was admissible on the basis of Reynolds' testimony because his description of what had happened was nearly identical to the sexual assault described by Readus, who similarly testified that the defendant started choking her as she struggled to push him away. The misconduct evidence likewise was admissible on the basis of Russell's testimony. Although Russell did not observe the defendant choking or sexually assaulting the victim, her testimony did not contradict Reynolds' testimony because Russell left the scene while the victim was still alive, and it is entirely possible that the three men exchanged roles before the victim died. Moreover, only Reynolds testified as to who was choking the victim at the moment of her death, and, accordingly, there was no inconsistency regarding that fact. That Russell, the eyewitness, saw three men attack the victim, whereas the defendant made no reference to any other participants in his confession to Reynolds, does not detract from the fact that both accounts described the same offense, which was a fight involving a sexual assault and choking that resulted in the victim's

death. We thus conclude that the attack on the victim and the attack on Readus were sufficiently similar to render the testimony of Readus admissible under the second prong of *DeJesus*.

The defendant argues that, to the extent the trial court may have relied on the testimony of Russell, *DeJesus* and its progeny did not involve defendants charged as accomplices in sex crimes, and that *DeJesus* still requires that a defendant himself must engage in both the charged and uncharged misconduct for the latter to be admissible. See *State* v. *DeJesus*, supra, 288 Conn. 474–75; see also *State* v. *Gupta*, 297 Conn. 211, 215–19, 998 A.2d 1085 (2010); *State* v. *Johnson*, 289 Conn. 437, 455–56, 958 A.2d 713 (2008); *State* v. *Snelgrove*, supra, 288 Conn. 762–64.[10] The defendant further argues that ignoring this precedent would vastly expand the concept of similarity articulated in *DeJesus* beyond the limits set by *Gupta*.[11] We need not consider this argument because, as previously discussed, the victim was still alive when Russell left the basement. Accordingly, to the extent the defendant's argument relies on Russell's description of the defendant as holding down the victim's arms, her testimony, unlike that of Reynolds, did not provide a complete portrayal of what had happened before the victim died and thus cannot be relied on to support the defendant's argument that the charged crime and the uncharged misconduct were dissimilar.

The defendant further claims that, to the extent the trial court may have relied on the testimony of Reynolds in deeming the uncharged misconduct admissible, it did so improperly because the state's "true claim" is that the defendant's only role in the crime was to hold down the victim's arms.[12] We disagree.

The state charged the defendant as both a principal and an accessory in the bill of particulars filed on February 15, 2012, without citing to the underlying evidence. The arrest warrant, however, included information obtained from both Russell and Reynolds, among many others. It is also undisputed that the state referred principally to the testimony of Reynolds during the pretrial hearing on the admissibility of the uncharged misconduct evidence. Thus, it cannot be said that the state's "true claim" was limited to the conduct described in Russell's testimony. Rather, the state relied on the testimony of both Russell and Reynolds in charging the defendant as a principal and an accessory. Accordingly, it was not improper for the trial court in the present case to consider whether the testimony of Readus was admissible under the second prong of *DeJesus*.

B

The defendant next claims that there were insufficient similarities between the victim and Readus to satisfy the third prong of *DeJesus*. We disagree.

It was within the discretion of the trial court to determine that the victim and Readus were sufficiently similar to satisfy the third prong of *DeJesus* because they were alike in age, ethnicity, their prior consensual sexual contact with the defendant and their resistance to the defendant's demands, which led to his choking them during the charged and uncharged misconduct. The evidence indicates that the victim and Readus were approximately thirty years old when the assaults occurred and that both women knew the defendant prior to the assaults. Although Readus may have known the defendant for a longer period of time, she identified the victim as the passenger in the defendant's car when he stopped by her home before the murder, thus indicating that the victim and the defendant were not strangers.

Moreover, even if Readus knew the defendant longer, the evidence supports the conclusion that both women were drug users and that their individual relationships with the defendant were based at least in part on sex in exchange for drugs. Although Russell described Readus as the defendant's girlfriend and Readus also identified herself as the defendant's "girl," she testified that she knew the defendant lived with another woman and that her own relationship with the defendant was a "drug and sex relationship . . . ." This was also true of the victim who, according to Reynolds, had consensual sex with the defendant in the basement at 17 Burton Street before he left to sell more drugs and then returned to commit the sexual assault and murder. Finally, both women were sexually assaulted and choked upon resisting the defendant's demands.

An analysis of the relevant case law on which the defendant relies does not persuade us otherwise. See, e.g., *State* v. *Johnson*, supra, 289 Conn. 455 (similar victims were prostitutes who had sex with defendant); *State* v. *Snelgrove*, supra, 288 Conn. 764 (similar victims were adult women who met defendant in social settings and voluntarily engaged in sex with him before he assaulted them); *State* v. *DeJesus*, supra, 288 Conn. 475 (similar victims were young women with mental disabilities who worked for defendant in store where they were assaulted); cf. *State* v. *Gupta*, supra, 297 Conn. 229–30 (dissimilar victim was female patient, like other victims, but also was defendant's employee, unlike other victims). No two victims in any particular case are exactly alike. A trial court thus must determine in each case whether the victims are sufficiently similar to satisfy the third prong of *DeJesus*. In *Snelgrove*, for example, we focused on the fact that all of the victims were adult women who had met the defendant in social settings and had engaged in sex with him voluntarily before the assaults; see *State* v. *Snelgrove*, supra, 764; and we did not consider the fact that one victim was a former girlfriend, another was a stranger, and the third was an acquaintance to be so important as to

overcome their other similarities under *DeJesus*. See id., 762–64. We thus conclude that the trial court did not abuse its discretion in determining that the third prong of *DeJesus* was satisfied.

C

The defendant also claims that the uncharged misconduct evidence was unduly prejudicial because the notion that the defendant had sexually assaulted a friend, namely, Readus, very likely overwhelmed and distracted the jury. We disagree.

The uncharged misconduct evidence was not as extreme as the charged crime because it did not result in Readus' death, and the trial court instructed the state to limit Readus' testimony to a "bare bones" account of the assault. The court also gave a limiting instruction immediately after Readus' testimony and in its final jury charge. See, e.g., *State* v. *Cutler*, 293 Conn. 303, 314, 977 A.2d 209 (2009) ("[w]e are mindful that a trial court's limiting instructions about the restricted purpose for which the jury may consider prior misconduct evidence serve to minimize any prejudicial effect that such evidence otherwise may have had" [internal quotation marks omitted]). Accordingly, we conclude that the prior misconduct evidence was unlikely to have aroused the jurors' emotions and that the trial court did not abuse its discretion in concluding that the evidence was admissible.

II

The defendant next claims that the trial court improperly rejected his claim under *Brady* v. *Maryland*, supra, 373 U.S. 83, that the state failed to disclose to the defense that it had offered Readus a "get out of jail free card" if she would testify for the state. The state responds that the trial court correctly found that there was no agreement or understanding between Readus and the state prior to her testimony and that any ideas regarding favorable treatment in return for her testimony arose in her mind only after a fellow inmate had suggested as much many days after the verdict in the present case. We agree with the state.

The following additional facts are relevant to our resolution of this claim. On March 14, 2012, six days after the jury returned a verdict of guilty on both counts, the Office of the State's Attorney in the judicial district of Waterbury received a letter from Readus, who was then incarcerated. The letter was postmarked March 13, 2012, and was addressed to the prosecutor, Terence D. Mariani, Jr., and one of his investigators, James Clary. In the letter, Readus wrote that she had been told that her daughter and grandson were being threatened because of her testimony in the defendant's case. She then wrote that she was "calling in a favor" and "need[ed] that . . . get out of jail free card [Clary] was talking about." Readus suggested that the prosecutor

"maybe . . . [could] put in a word for [her] with the state and the judge" that would facilitate her release from prison with restrictions, conditions or the imposition of a fine. She concluded: "I need [your] help now just like you needed me." She added in a postscript: "[D]id we put him away?"

The prosecutor immediately notified the defense of the letter and its contents. The defendant responded by filing a motion for a new trial on the grounds that (1) the state had violated *Brady* by failing to disclose exculpatory material, namely, an alleged agreement or understanding that Readus would be given a benefit if she testified for the state, (2) the information in the letter constituted newly discovered evidence, and (3) the defendant's conviction was obtained through the perjured testimony of Readus.

On the day scheduled for sentencing, the trial court instead held a hearing on the defendant's motion. The first witness was Readus, who was appointed counsel for purposes of the hearing and waived her fifth amendment privilege against self-incrimination following a canvas by the court. Readus testified that she initially became aware that the Office of the State's Attorney was looking for her in connection with the present case after a woman named Gloria Guy gave her Clary's business card and said that Clary had been showing Readus' photograph around the neighborhood and wanted Readus to contact him. At that time, Guy said nothing to Readus about a "get out of jail free card . . . ." Readus was on probation for a prior offense but had no pending cases and had not known that Clary was looking for her. Readus later contacted Clary and met with him and the prosecutor, among others, several times to discuss what she knew about the case and whether she would be testifying. During one of these meetings, Readus gave the police a statement that later formed the basis for her testimony at trial.

The day before Readus was scheduled to testify, she was arrested in connection with a shoplifting incident involving her boyfriend and was detained at the Waterbury Police Department overnight. When she was brought to the Waterbury courthouse the next day, she asked the marshals to contact Clary to let him know about her situation and that she would not be able to comply with the subpoena requiring her to testify at trial. Clary, however, eventually made arrangements to bring Readus to the courtroom. Readus thereafter testified that, as of the date of the hearing on the defendant's motion, the larceny charges had not been resolved and she had not been charged with a probation violation.

Regarding the letter, Readus testified as follows: "I wrote [the prosecutor] a letter and I explained to him, but, before that, [neither the prosecutor] nor . . . Clary . . . promised me anything. How I found out was

people [were] coming to jail telling me things, that they were looking for me, and they said I could get out of jail free and all this. It was because of my daughter [that] I wrote that letter. That's the only reason why." Readus testified that she did not hear about the "get out of jail free card" from Clary or the prosecutor and that "[i]t just came from people that came to jail." When she was asked to name the people from whom she heard this language, Readus at first refused to identify anyone. After the trial court ordered her to do so, she named Guy but stated that their conversation took place after Readus was transferred to York Correctional Institution (York), which occurred after she appeared as a witness for the state in the defendant's case on March 5, 2012.

Readus emphasized at the hearing that she never had been promised anything by Clary or anyone else in the Office of the State's Attorney in return for her testimony at trial. She further stated that she had no expectation when she testified at trial that she would obtain future favors from the state. She explained that her use of the phrase "calling in a favor" when writing the letter was inaccurate and that she really was asking the state for a favor rather than calling one in.

The prosecutor next testified that he had made no promises to Readus in exchange for her testimony at trial and that no one else in his office had made any such promises in his presence. Clary also denied telling anyone he spoke to when initially trying to locate Readus that she would receive any benefits or that it would be in her best interest to get in touch with his office. Clary stated that he told no one why he wanted to speak with Readus but only that it was important and that he "need[ed] to speak to her as soon as possible." He also specifically denied telling Guy that Readus would be given a "get out of jail free card" if she cooperated with the state. He admitted only that when Readus indicated being nervous about testifying and told him about the threats to her daughter or grandchild, he told her that she should feel free to contact him if she believed her safety was in jeopardy.

Readus' probation officer, Megan Clifford, testified that the reason Readus had not yet been charged with a violation of probation as a result of her larceny arrest, which Clifford attributed to the stress Readus was experiencing at that time, was that Readus otherwise had complied with the conditions of her probation and had been responding to her outpatient drug treatment. Clifford thus believed the more appropriate response was to try to get Readus into an inpatient treatment facility after her release from custody for the larceny arrest.

Finally, Erin Murphy-Pelletier, an official with the Department of Correction, testified that, according to official records, Guy did not arrive at York until April 17, 2012, more than one month after Readus claimed to

have spoken with Guy about Clary's alleged statements.

After hearing this and other sometimes contrary testimony, the trial court denied the defendant's motion for a new trial. Among the trial court's findings were: (1) Clary told one or more persons with whom he spoke when looking in the neighborhood for Readus that they should tell her that he might have a "get out of jail free card" for her; (2) four days after the jury verdict in the defendant's case, when Readus was incarcerated at York, another woman inmate informed her that Clary had been looking for her about one month earlier and said he had a "get out of jail free card," and, as a result of this comment, the woman encouraged Readus to write to the Office of the State's Attorney and ask for assistance with her pending larceny case; (3) at no time prior to Readus' testimony did the Office of the State's Attorney promise her anything in exchange for her testimony; (4) Readus did not believe when she testified at trial that any promises had been made to her; (5) neither Mariani nor Clary had promised her anything, including a "get out of jail free card," in exchange for her testimony; (6) Readus was untruthful in identifying Guy as the person who told her about the "get out of jail free card" because she did not want to identify the person who told her; (7) the remainder of Readus' testimony regarding how she came to learn about the "get out of jail free card" was credible; and (8) Clifford chose not to have Readus charged with a violation of probation because she believed it would be better if Readus continued with her probation and drug treatment to address her problems and not because of an agreement with the state.

We begin with the standard of review. The defendant's claim that the trial court improperly rejected his *Brady* claim is, in reality, a claim that the court improperly denied his motion for a new trial on the ground that there was no *Brady* violation. "Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a new trial], we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 699 n.66, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

With respect to the *Brady* claim, "[t]he law governing

the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material. . . .

"It is well established that [i]mpeachment evidence as well as exculpatory evidence [fall] within *Brady*'s definition of evidence favorable to an accused. . . . [An express or implied] plea agreement between the state and a key witness is impeachment evidence falling within the definition of exculpatory evidence contained in *Brady*. . . .

"The [United States] Supreme Court established a framework for the application of *Brady* to witness plea agreements in *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), and *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). . . . Drawing from these cases, this court has stated: [D]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception. . . . Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . . A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . .

"The prerequisite of any claim under the *Brady*, *Napue* and *Giglio* line of cases is the existence of an undisclosed agreement or understanding between the cooperating witness and the state. . . . Normally, this is a fact based claim to be determined by the trial court, subject only to review for clear error." (Citations omitted; internal quotation marks omitted.) *State* v. *Ouellette*, 295 Conn. 173, 185–87, 989 A.2d 1048 (2010).

In the present case, the trial court conducted an evidentiary hearing and made several factual findings regarding the existence of an express or implied undisclosed agreement, including that, at no time prior to trial did the Office of the State's Attorney promise Readus anything in exchange for her testimony, Readus did not believe at that time that any promises had been made to her, and neither Mariani nor Clary promised Readus anything, including a "get out of jail free card," in exchange for her testimony. The defendant acknowledges these findings but, instead of challenging them

as clearly erroneous, argues that "[t]he court found that the state made [an] offer of leniency but it was not material because it was never conveyed . . . to Readus before she testified. The court [thus] erred because one or more jurors reasonably could have inferred that [Readus] heard about Clary's offer before she testified, and, therefore, the offer was material." The defendant then cites the standard of review for a trial court's determination regarding materiality and argues that the state must disclose evidence favorable to the defendant when the evidence is material to his guilt. The defendant further argues that the evidence in the present case was favorable to the defense, the evidence was suppressed, and the evidence was material. The defendant concludes by stating that "one or more jurors could have reasonably inferred that Readus heard about Clary's promise before she testified" and that the "court [improperly] treated its inference as the only reasonable inference . . . . The state's failure to disclose Clary's offer of a get out of jail free card to Readus undermines confidence in the outcome of [the defendant's] trial." (Internal quotation marks omitted.)

We quote extensively from the defendant's brief to show that he does not challenge the trial court's findings regarding the existence of an undisclosed agreement on the ground that they were clearly erroneous. Rather, he argues that the jurors could have examined the evidence and reached a different conclusion, and that, if Readus knew about the get out of jail free card before she testified, as he claims the jurors could have concluded, such evidence was material and should have been disclosed to the defendant. As previously noted, however, "[t]he prerequisite of any claim under the *Brady, Napue* and *Giglio* line of cases is the existence of an undisclosed agreement or understanding between the cooperating witness and the state"; *State* v. *Ouellette*, supra, 295 Conn. 186; a determination that is made by the trial court and must be reviewed for clear error. Id., 187. Accordingly, we reject the defendant's *Brady* claim and conclude that the trial court did not abuse its discretion in denying his motion for a new trial because he has failed to challenge as clearly erroneous the trial court's finding that there was no undisclosed agreement or understanding between Readus and the state, which is a necessary predicate to his arguments on materiality.

### III

The defendant finally claims that the trial court improperly permitted the prosecutor to exercise a peremptory challenge with respect to J.W.,[13] an African-American venireperson, in violation of *Batson* v. *Kentucky*, supra, 476 U.S. 79. The defendant specifically claims that the prosecutor challenged J.W. because he knew too many people in the area and he might have known the victim, but accepted M.C., a Caucasian

venireperson who might have known just as many people in the area. The state responds that the trial court properly rejected the defendant's *Batson* claim because J.W. demonstrated a much greater familiarity with the area and persons connected with the case than M.C. The state also argues that the defendant makes no claim that the prosecutor's use of peremptory challenges with respect to any other venirepersons suggested a potentially discriminatory intent, which is one of the factors considered in determining whether a violation of *Batson* has occurred. See id., 96–98. We agree with the state.

The following additional facts are relevant to our resolution of this issue. Before the individual voir dire, venireperson J.W. raised his hand when the court asked whether those present knew any of the persons whom the attorneys listed as being associated with the case. In contrast, venireperson M.C. did not raise her hand or otherwise indicate her familiarity with any of the listed persons.

Thereafter, prior to individual voir dire, the trial court queried J.W., who stated that he knew John Maia, one of the persons listed as being associated with the case, through a mutual acquaintance and occasionally saw him. J.W. also stated that "[t]he victim's name sound[ed] familiar, but [he could not] actually picture the face." Despite these comments, the court did not dismiss J.W. for cause.

Individual voir dire of M.C. and J.W. occurred later that day. There is no indication in the record of M.C.'s race. M.C. stated that she was a full-time health care worker at Saint Mary's Hospital in Waterbury, where she had been employed for forty-three years. She also stated that she had lived in Waterbury when she was younger and had attended Waterbury Catholic High School but had moved to Watertown thirty-five years earlier and had lived there ever since. When asked if she could find her way to Burton Street without seeking directions, M.C. answered that she could not. M.C. also indicated that she had never known anyone who had been charged with a crime or had been the victim of a crime. In addition, she was highly complimentary of the Waterbury Police Department and stated that she had an amicable relationship with the Office of the State's Attorney when she worked on several child abuse cases as a health care worker. M.C. subsequently was deemed acceptable by both parties.

After M.C. was accepted as a juror, the parties questioned J.W., who the court noted for the record appeared to be African-American. J.W. clarified at that time that he knew Maia through two sources, namely, his godparents and his ex-wife, whose family knew Maia very well. Upon further questioning by the prosecutor regarding his familiarity with the victim, J.W. again indicated that her name sounded familiar. He further explained that he knew the victim's brother but was

uncertain if he had known the victim, although he might have remembered the victim's name from having heard about the case in 1999. When asked whether he would be troubled, after viewing the autopsy photographs, if he recognized the victim as someone he had known, J.W. responded: "Possibly, I'm not too sure."

With respect to the names listed by the attorneys, J.W. said he would have to see a face in order to be certain of whether he knew the named person and that he probably had gone to school with a lot of people in the area. He stated he had grown up in Waterbury, had attended Crosby High School, and probably knew many people from Waterbury, although more by face than by name. He also stated he was "[a] little" familiar with the Burton Street area but had never hung out there. He indicated that his "god brother" had been convicted of armed robbery and attempted murder about twelve years earlier. He added that he was forty years old and that some of his ex-wife's family members were employed by the Department of Correction.

The prosecutor asked the court to excuse J.W. for cause, noting that J.W. had expressed familiarity with the victim's name and that the victim, like some of J.W.'s ex-wife's family members, had worked for the Department of Correction. The prosecutor also expressed concern that his key witnesses were from the north end of Waterbury, the witnesses were within one or two years of J.W.'s age, and J.W. was likely to know people from the north end or from the Burton Street neighborhood, which could color his view of the testimony adduced at trial. The court denied the prosecutor's challenge for cause, explaining that it did not believe that J.W. showed sufficient familiarity with the victim or any of the potential witnesses to justify being excused for cause.

The prosecutor then indicated that he wished to exercise a peremptory challenge with respect to J.W. Defense counsel responded by asking the court to note that J.W. and the defendant are both African-American. She also asked the prosecutor to explain his reasons for seeking to excuse J.W. The prosecutor reiterated his earlier concerns regarding J.W.'s possible knowledge of, and opinion regarding, witnesses from a neighborhood with which J.W. was familiar, and the similarity of J.W.'s age and that of the potential witnesses, adding that he would have the same concerns if J.W. was Caucasian or Hispanic. Defense counsel noted that the prosecutor had not tried to excuse M.C., even though she had worked at a local hospital for forty-three years and might also recognize some of the witnesses. The court immediately rejected defense counsel's comparison, however, stating that M.C. had lived in Watertown for the past thirty-five years and had dealt mostly with staff rather than patients at the hospital where she worked, whereas J.W. might actually know some of the wit-

nesses who would testify at trial. The court thus concluded that the prosecutor had articulated a neutral, nondiscriminatory basis for the peremptory challenge. Nevertheless, the court stated that it would be watching to see if a discriminatory pattern developed during the remainder of the juror selection process, although it did not believe that such a pattern was "even close" to developing. The defense did not test any other peremptory challenge by the prosecutor for the remainder of the jury selection process. At the end of jury selection, the prosecutor had eight unused peremptory challenges. One other juror was identified on the record as African-American, and there is nothing in the record indicating the race of any of the other venirepersons questioned or of any of the jurors and alternate jurors seated.

We begin with the governing legal principles and the standard of review. "In *Batson* . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the [e]qual [p]rotection [c]lause forbids [a party] to challenge potential jurors solely on account of their race . . . . *State* v. *Peeler*, 267 Conn. 611, 620–21, 841 A.2d 181 (2004). . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race]. . . . These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race . . .

were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race . . . as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race . . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to [a party's] intent. The [judicial] officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Latour*, 276 Conn. 399, 408–10, 886 A.2d 404 (2005).

In the present case, the defendant claims that the prosecutor violated *Batson* when he accepted a Caucasian venireperson, M.C., who held views similar to those of an African-American venireperson, J.W., whom the prosecutor prevented from serving on the jury by way of a peremptory challenge. The defendant contends that a side-by-side comparison of J.W. and M.C. shows that the prosecutor treated African-American venirepersons differently from other venirepersons and that the prosecutor's failure to explain why he had accepted M.C. but rejected J.W. requires reversal because the prosecutor did not rebut the inference of discrimination. Thus, in the absence of an explanation for the different treat-

ment of these two venirepersons, the defendant claims he has established purposeful discrimination because the prosecutor failed to meet his burden of offering a race neutral explanation for his use of the peremptory challenge to exclude J.W.

The state responds that the trial court properly rejected the defendant's *Batson* claim because the record does not support the defendant's view that M.C. and J.W. were similar with respect to their familiarity with the neighborhood in which the crime occurred. The state also argues that the trial court's immediate recognition of the differences between M.C. and J.W. relative to their familiarity with the neighborhood and the people involved in the case made it unnecessary for the prosecutor to articulate other differences between them. These differences included that J.W.'s "god brother" was prosecuted for murder in the same Waterbury courthouse, whereas M.C. had never known anyone charged with a crime and had worked well with the Office of the State's Attorney. We agree with the state.

It is well established that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered [under *Batson*] . . . ." *Miller-El* v. *Dretke*, 545 U.S. 231, 241, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005); see also *State* v. *Latour*, supra, 276 Conn. 409. In the present case, the prosecutor exercised a peremptory challenge to exclude J.W. on the grounds that J.W. had indicated some degree of familiarity with the victim's name and that the victim had worked for the Department of Correction, as had some of J.W.'s ex-wife's family members. The prosecutor also was concerned that the state's key witnesses were from the same neighborhood with which J.W. was familiar and were about the same age as J.W., and that J.W.'s familiarity with a neighborhood witness could color his view of the witness' testimony. Although it was the trial court that responded to defense counsel's interjection that the same could be true of anyone from a small community who was older than twenty-one years of age,[14] the prosecutor provided the required explanation as to why he had challenged J.W., and the evidence in the record supported the trial court's factual finding that important differences existed between M.C. and J.W. This included evidence that M.C. was much older than J.W. because she had been employed for forty-three years, thus implying that she would not be as likely to know any witnesses who were about J.W.'s age. M.C. also no longer lived in Waterbury; indeed, she had moved to Watertown thirty-five years earlier and had lived there ever since. In addition, M.C. testified that she would not be able to find her way to Burton Street without seeking directions, she had never known anyone who had been charged with a crime or was the victim of a crime, and she was highly complimentary

of the Waterbury Police Department. Most significantly, M.C.'s employment at Saint Mary's Hospital did not bring her into constant contact with its patients because she worked mostly with staff, which limited her potential exposure to persons living in Waterbury and the neighborhood in which the crime had occurred. The trial court also noted, with respect to the prosecutor's credibility, that it had presided over other trials at which the prosecutor selected juries and had no concern that he ever had sought to excuse potential jurors on the basis of their race. The court nonetheless stated that it would look for a pattern of possible discrimination as the jury selection process continued, although it did not believe it was "even close" to finding such a pattern.[15] Accordingly, under the deferential standard we apply to claims of purposeful discrimination, we cannot conclude that the trial court's findings regarding the differences between M.C. and J.W., and its finding that the prosecutor had proffered a race neutral explanation for his peremptory challenge to exclude J.W. as a juror, were clearly erroneous. See *State* v. *Latour*, supra, 409–10.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime . . . he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[3] Russell later explained that she had resisted talking to the police for many years because she lived in Waterbury and was afraid of Lawrence Andrews, an acquaintance of the defendant, and his friends, but that she had decided to speak with the police after they attempted to obtain information from her sister, in whom she had confided "a little bit" on the evening of the murder so that she would help Russell leave Waterbury.

[4] Reynolds first provided this evidence to the Office of the State's Attorney in the judicial district of Waterbury in 2003. The authorities did not use it, however, until they obtained additional evidence from Russell and received the DNA results. Reynolds stated at trial that he agreed to testify against the defendant in exchange for the state's agreement to allow him to seek modification of a sentence he then was serving and for the state's assistance in keeping him housed at a certain prison facility.

[5] The defendant initially was charged by information dated March 4, 2009, with one count of felony murder. The state subsequently filed a substitute information dated February 3, 2012, charging the defendant with murder and felony murder. The felony murder charge was based on theories of both principal and accessory liability for attempted robbery and/or sexual assault in the first degree.

[6] Readus did not know the woman in the defendant's car but had seen her around town. After reading about the victim's murder in the newspaper, however, Readus realized that the victim was the woman whom she had seen in the defendant's car. It is unclear exactly when the uncharged misconduct described by Readus occurred, but the record suggests that it occurred within hours following the victim's murder. Neither party has argued that the uncharged misconduct evidence was inadmissible because it occurred after, rather than before, the charged offenses.

[7] The state had argued that, according to its calculations, the victim and Readus were only three years apart in age and both had had consensual

sex with the defendant around the time of the victim's murder.

[8] The court stated that the state's proffer suggested that the defendant reacted to women who had not given him what he wanted by engaging in sexual violence. In the case of Readus, the defendant engaged in sexual violence after she argued with him about his unfaithfulness and, in the victim's case, after she refused to give the defendant drugs or money.

[9] The defense conceded at trial that the uncharged misconduct was not too remote in time under the first prong of *DeJesus*, and, therefore, the defendant does not challenge on appeal the trial court's decision with respect to that issue.

[10] See *State* v. *Gupta*, supra, 297 Conn. 215–19, 226 (finding misconduct in two cases in which defendant physician improperly touched breasts of patients during medical exams without bona fide medical purpose dissimilar to misconduct in third case in which defendant made improper sexual comments to patient and sucked her breasts during medical exam, and, therefore, evidence was not cross admissible); *State* v. *Johnson*, supra, 289 Conn. 440–43, 455–56 (finding evidence of murders cross admissible under *DeJesus* when defendant's semen was found in or on victims, victims died from blunt force trauma to head, and victims were found partially nude, their shirts pushed up, and their pants dangling from their left legs in publicly accessible but secluded places within one mile of each other); *State* v. *Snelgrove*, supra, 288 Conn. 764 (finding charged and other crimes similar when defendant met victims in public places on weekend nights, socialized with victims, left location at same time as victims, engaged in voluntary sexual activities with victims before committing crime, and attempted to kill himself following commission of crimes against two of three victims); *State* v. *DeJesus*, supra, 288 Conn. 474–75 (finding charged and uncharged misconduct similar when defendant used supervisory authority to lure young female employees with mental disabilities to empty, isolated room on upper level of store where he sexually assaulted them).

[11] The defendant relies on *State* v. *Ellis*, 270 Conn. 337, 852 A.2d 676 (2004), but *Ellis* was decided four years before *DeJesus* and, therefore, is not among its progeny, as the defendant claims.

[12] The defendant also claims that Reynolds' testimony is not relevant because this court concluded in *State* v. *Snelgrove*, supra, 288 Conn. 763–64 n.9, that the testimony of a jailhouse informant was not pertinent to a relevancy analysis under *DeJesus*. We disagree. The defendant takes our statement in *Snelgrove* regarding the testimony of a jailhouse informant out of context. In *Snelgrove*, the defendant claimed that the testimony of the jailhouse informant in that case lacked credibility because it had been given as part of a plea deal pursuant to which the informant "was spared the death penalty in his own criminal case . . . ." Id., 763 n.9. In response to that claim, we stated that "[the informant's] testimony [was] not pertinent to our relevancy analysis under *DeJesus*. The testimony was intended not to establish that the victim was killed in a manner similar to the manner in which the defendant had killed [or assaulted the other two victims], but to establish that the defendant had killed the victim. If we were to assume that [the informant] was telling the truth, his testimony would be sufficient to establish the defendant's guilt, and there would be no need to consider whether his conduct toward the victim was similar to his conduct toward [the other two victims]. If [the informant] was lying, there would be no basis for a conclusion that the victim was strangled." (Emphasis omitted.) Id., 764 n.9.

To the extent there may be any misunderstanding, we clarify that our comments in *Snelgrove* were directed to the credibility of the jailhouse informant's testimony in that case, and we did not mean that the testimony of a jailhouse informant could not be used in conducting a *DeJesus* analysis. To the contrary, if a jailhouse informant's testimony shows not only that a defendant killed the victim but did so in a certain manner, that testimony, along with other evidence, may serve as a basis for comparing the charged and uncharged misconduct evidence to determine whether it is sufficiently similar for the latter to be deemed admissible.

[13] We use the initials of the venireperson to protect his or her legitimate privacy interests. E.g., *State* v. *Peeler*, 267 Conn. 611, 620 n.9, 841 A.2d 181 (2004).

[14] Insofar as the defendant claims that the prosecutor failed to satisfy his burden of providing a race neutral explanation because he did not specifically address his reasons for *not* exercising a peremptory challenge against M.C., he misconstrues the applicable standard. As previously noted, the party exercising the peremptory challenge must provide a race neutral expla-

nation *for the challenge,* and the opposing party then must establish that the explanation is insufficient or pretextual. See, e.g., *State* v. *Latour,* supra, 276 Conn. 408 ("Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, *the* [*opposing party*] *must advance a neutral explanation for the venireperson's removal.* . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination." [Emphasis added; internal quotation marks omitted.]). In the present case, the prosecutor explained its race neutral reasons for seeking to exclude J.W., and the defense failed to convince the court that M.C. and J.W. were similar. Thus, because the record supported the trial court's reasoning, we defer to its decision.

[15] As previously discussed, the record indicates that the defense did not object to any other of the prosecutor's peremptory challenges and that the prosecutor had eight remaining peremptory challenges at the end of the jury selection process. In addition, one other juror was identified on the record as being African-American. No other jurors or alternate jurors seated and no other venirepersons were identified on the record by their race.